**In re Fred D. TROST, Debtor.**

**BUCKSTOP LURE COMPANY, Plaintiff,**

v.

**Fred D. TROST, Defendant.**

**Bankruptcy No. SL 92–85533.**
**Adv. No. 93–8003.**

United States Bankruptcy Court,
W.D. Michigan.

March 7, 1994.

Jaye M. Bergamini, Glassen, Rhead, Mc-Lean, Campbell & Bergamini, Lansing, MI, for plaintiff Buckstop Lure Co.

Frederick J. Blackmond, Lansing, MI, for debtor/defendant Fred D. Trost.

**OPINION REVOKING DISCHARGE PURSUANT TO 11 U.S.C. § 727(d)(1) and (2)**

JO ANN C. STEVENSON, Bankruptcy Judge.

## INTRODUCTION

This case presents a textbook example of an individual, who finding himself in a seriously precarious financial position as a result of a $4 million defamation judgment, filed a Chapter 7 petition. Although Defendant sought to reap the substantial benefits which flow from filing bankruptcy, he elected to ignore the minimal but necessary requirements which the Bankruptcy Code concomitantly imposes. By his own fraud, deceit, and seemingly complete disregard for the integrity of the bankruptcy process, the Debtor has derailed himself on his way to obtaining the "fresh start" which Chapter 7 offers. And all this has been done because of a $500 account receivable and 5,000 shares of corporate stock of a seemingly worthless corporation.

## JURISDICTION

This adversary proceeding arises in a case referred to this Court by the Standing Order of Reference entered in this district on July 24, 1984 and is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). Accordingly, this Court is au-

thorized to enter a final judgment subject to the right of appeal provided by 28 U.S.C. § 158(a).

The following constitutes the Court's findings of fact and conclusions of law in accordance with FED.R.BANKR.P. 7052. In reaching its determinations, the Court considered the demeanor and credibility of the seven witnesses who testified, John Porter, Cathy Beutler, Michelyn Pasteur, Joanne Cribley, Zachary Trost, John Ford, III, Douglas Tabor, and Debtor Fred D. Trost. The admitted exhibits, whether or not each specific item of evidence is referenced in this decision, were also considered unless otherwise indicated herein.

## FACTS

The Debtor and Defendant in this case, Fred D. Trost, is a well-known, successful television and publication personality in Michigan. Until he filed Chapter 7 in 1992, he published a magazine called "Fred Trost's Michigan Outdoors" and produced a television show by the same name. Both the magazine and the television show were generated by Fred Trost Enterprises, Inc. (FTE), a corporation of which he was the sole shareholder.

Plaintiff Buckstop Lure Company, Inc., produces hunting scent products. Mr. Trost utilized his access to the public to disparage Plaintiff and its product. Specifically, Defendant claimed that the scents sold by Plaintiff, although advertised as containing deer urine, actually contained cow urine. Plaintiff instituted an action for defamation against Defendants Fred Trost and FTE in Montcalm County Circuit Court. On February 7, 1992, the jury returned a remarkable $4 million verdict against both Defendants. On October 9, 1992 Defendant filed chapter 7 and on January 6, 1993, this Court granted him a discharge. Plaintiff's present action alleges that Defendant fraudulently and intentionally concealed his entitlement to payments and ownership of assets and requests that this Court revoke Defendant's discharge pursuant to 11 U.S.C. section 727(d).[1]

---

1. On January 5, 1993, Buckstop Lure Company ("Buckstop") filed adversary proceeding number

93–8003 seeking to have the $4 million judgment declared nondischargeable pursuant to 11 U.S.C.

To say that Defendant was less than honest in his disclosure to this Court and to his creditors would be a gross understatement. Although the Court bases its opinion on two of his most egregious deceptions, Defendant was dishonest about several other prepetition transactions and assets. The Court found these other incidents indicative of Defendant's disrespect for the system and his dishonesty in a process requiring complete disclosure and truthfulness. These "minor" transgressions are relevant for providing the context in which Defendant committed the fraud alleged in Plaintiff's complaint.

Defendant's petition is replete with omissions and untruths. First, Defendant failed to disclose money due him on his schedules. According to Defendant's 1991 income tax return, Defendant had loaned FTE $45,781.41 that year. This loan was neither listed in his original schedules filed on October 9, 1992 or in his amended schedules filed on March 10, 1993. When asked by Plaintiff's attorney why he failed to disclose the sum owed him by FTE, Defendant said that he did not know and that he, "paid accountants and attorneys to worry about things like that." This is a significant amount of money to "forget" and not expect repayment of, especially by an individual who ran his own business.

Similarly, Defendant did not mention an additional $500 owed him. Defendant received a check in that amount dated October 24, 1992 from Fred Trost's Outdoors Club just two weeks after filing. Although Defendant could not remember what he had done to entitle him to payment, he was absolutely certain that the money was for services he performed postpetition. The Court finds this selective, self-serving recollection unreliable, especially when considered in context with Defendant's other omissions and misrepresentations.

Defendant also failed to list a transfer of his land contract vendee's interest in a parcel of property located in Bath, Michigan. Orig-inally, Defendant and his wife Sherry Trost were listed as the land contract vendees on the September 28, 1991 land contract. The year before he filed his petition, Defendant transferred his interest in this property to his son Zachary Trost for no consideration. At Defendant's 2004 exam on November 12, 1992, Plaintiff's counsel gave Defendant ample opportunity to disclose the transfer. The exchange at the 2004 exam went as follows:

Q. Within a year of filing bankruptcy, Mr. Trost, did you transfer any other property to any member of your family?

A. Within a year prior to the bankruptcy I—are we talking personal property?

Q. Any type of property, sir.

A. No, I mean—

Q. You didn't transfer anything to any member of your family?

A. I mean, not that I can remember. I mean—

\*　　\*　　\*　　\*　　\*　　\*

Q. I would be talking about shares of stock or—

A. No shares of stock.

Q. —contractual rights or anything of that nature.

A. There were contractual rights, yes.

\*　　\*　　\*　　\*　　\*　　\*

Q. Did you transfer anything to Zach Trost?

A. Other than personal things to put in the museum, no.

Q. Okay.

A. I mean, no, I mean.

Q. Is there anything that you're confused about, sir, is there any transaction that you're thinking of you're not sure fits my question?

A. I'm not thinking of any transaction. I'm getting confused, here.

\*　　\*　　\*　　\*　　\*　　\*

§ 523(a)(6). On February 9, 1993 Buckstop filed a second adversary, number 93–8065 seeking to revoke Debtor's discharge pursuant to 11 U.S.C. § 727(d)(1) and (2). This Court's May 12, 1993 Joint Pretrial Order consolidated both adversaries under number 93–8003. The nondis-chargeability claim was designated Count I and the revocation of discharge was designated Count II. Plaintiff chose to proceed first with the latter count which was tried before this Court on February 8 and 9, 1994.

Q. Well, if there are any—if there's anything that you did in the last year that you're not sure whether it meets that definition, you should tell me, and we'll sort it out.

A. Let me review my last year. No, I do not believe so.

At trial Defendant's twenty-five year-old son Zachary testified that he had completed the purchase of the Bath land subject to the land contract. His testimony was not helpful to his father's case, however. Zachary was arrogant, evasive, argumentative and profoundly unknowledgeable as to the quality of estate he held with his stepmother Sherry Trost. When questioned, he stated that he purchased the property with money taken from his personal account.

Defendant also failed to honestly disclose the amount of cash on hand at the time of filing. According to his petition, Defendant only had ten dollars in cash on October 7, 1992.[2] Subsequently obtained bank records for that day indicate that Defendant wrote "cash" checks to himself in the amount of roughly $3800 (Plaintiff's Exhibits 6, 7, and 8). Defendant claims that on the advice of his attorney he was trying to liquidate assets to pay creditors before filing his petition. He was able to account for some $1,500 of the cash. When asked by Plaintiff's counsel to account for the remaining $2,000, Defendant was only able to recall paying his dentist and a record club. Neither payment was listed in Defendant's schedules, however. Defendant reluctantly admitted that the cash on hand listed in his petition was probably inaccurate.

Plaintiff explained that although it knew about these fabrications and omissions prior to Defendant's discharge, it did not file a complaint objecting to discharge because all of these matters—unlike the instances of fraud alleged in its complaint—were not worth much monetarily. Nevertheless, the Court considers Defendant's dishonesty in the above matters to be probative of his credibility in general and his disregard for the bankruptcy process.

Plaintiff's complaint alleges that Defendant committed fraud on two separate occasions. First, Plaintiff claims that at the time Defendant signed his petition under penalty of perjury, he failed to declare assets in the form of money due him. After he filed, he was paid money for prepetition services, which he neither disclosed nor turned over to the trustee.

Second, Plaintiff claims that Mr. Trost intentionally omitted assets in the form of FTE stock from his schedules in an effort to convert them to his own benefit and keep them out of the hands of his creditors. These action, Plaintiff asserts, constitute fraud in fact, warranting a revocation of discharge pursuant to 11 U.S.C. § 727. The Court agrees.

### ANALYSIS

Plaintiff seeks revocation of discharge pursuant to 11 U.S.C. § 727(d)(1) and (2), which state:

(d) On request of the trustee, a creditor, or the United States Trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;

(2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee.

We note at the outset that revoking a discharge is an extraordinary remedy. Section 727's revocation of discharge is construed liberally in favor of the debtor and strictly against those objecting to discharge. *In re Adeeb*, 787 F.2d 1339 (9th Cir.1986).

---

**2.** Although defendant signed his petition and gave it to his attorney on October 7, 1992, it was not filed with the Court until October 9, 1992.

The finality of the discharge order must be given special consideration. Such an order, which is the ultimate goal of a debtor, must not be set aside merely because of ignorance of the law or carelessness of the parties. *In re Jones,* 111 B.R. 674, 679 (Bankr.E.D.Tenn. 1990).

■ Plaintiff bears the burden of proving its case by a preponderance of evidence. The United States Supreme Court has held a preponderance to be the standard in a challenge to dischargeability under 11 U.S.C. § 523 in *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). We follow those courts which have applied the same standard to section 727 complaints. *In re Sumpter,* 136 B.R. 690 (Bankr.E.D.Mich. 1991), *In re Serafini,* 938 F.2d 1156 (10th Cir.1991).

We address first the allegation that Defendant failed to declare assets in the form of money due him on his schedules for services performed prepetition. On October 8, 1992, one day after Defendant signed his petition but one day prior to it actually being filed, Defendant performed a pledge break at Central Michigan University (CMU) for WCMU–TV. Pledge breaks are the commercials of public television. Generally they feature well-known personalities who ask viewers to support the programming by pledging monetary support. Defendant frequently does pledge breaks for WCMU–TV and other public television stations. In exchange for his doing the pledge break on October 8, 1992 Defendant was paid $500. Defendant failed to report this money on his original schedule, however, even though he knew before filing that he would be performing a pledge break on October 8. When asked to account for his failure to report the expected earnings on his schedule, Defendant responded with several explanations, all evidencing varying degrees of duplicity.

Defendant's first explanation was that on October 7 he did not anticipate being paid for the pledge break because he would no longer have a show as of the date of filing and was not sure whether WCMU would want to pay him absent his association with his popular television show. Testimony was introduced, however, that indicated Defendant was always paid for his pledge breaks. The Court does not find Defendant's explanation credible. If anything, the fact that the well-publicized feud between Plaintiff and Defendant ended with Defendant filing bankruptcy would likely draw even more viewer attention to Defendant.

Defendant's next rationalization for failing to report the $500 expected payment for the pledge break is that he assumed his petition would be filed on October 7, the day he signed it and gave it to his attorneys. Thus, October 8 would be the first day of postpetition activity and receipt of earnings not earmarked for the bankruptcy estate. Defendant claimed that he did not know the petition was actually filed on October 9 until shortly before the commencement of this adversary proceeding, which was filed on January 5, 1993. Even if Defendant's initial misunderstanding of when his petition was filed was valid, he knew or should have known of the correct filing date when he received the October 14 Notice of Commencement of the Case under Chapter 7 of the Bankruptcy Code, Meeting of Creditors and Fixing of Dates. That "first meeting notice" clearly identified October 9, 1992 as the filing date.[3] Surely by the time Defendant filed his amended schedules on March 10, 1993 he was aware of the actual filing date, yet his amended schedules, like the originals, did not mention the $500 he received for performing the October 8, 1992 CMU pledge break.

In addition to failing to list the $500 on his schedules, Defendant prevaricated about expecting payment. At his 341 meeting Defendant testified that he recalled telling Trustee John Porter on November 6, 1992 that he

---

**3.** The Court's file contains a properly certified proof of service indicating that Mr. Trost received a copy of the first meeting notice. When presented with a copy of the first meeting notice, Mr. Trost stated that he did not remember ever having seen it. This was amplified by his statement that for a while after the filing he was not reading any of his mail. Since the Court file does not indicate that the Defendant's copy of the first meeting notice was returned by the post office, we take him at his word and assume that Mr. Trost simply chose to ignore mail sent to him by the Bankruptcy Court.

had no accounts receivable. When Plaintiff's counsel pursued this line of questioning, Defendant claimed that he had ·not thought of nor expected payment until Cathy Beutler, a co-worker who had helped him with the pledge break, approached him on December 1, 1992, almost two months after they earned the money, and asked him for payment. To support this assertion, Defendant referred to a letter he sent CMU dated December 1, 1992 that requested payment for the October 8 pledge and a CMU invoice indicating payment of the requested amount (Plaintiff's Exhibit 10). Defendant insisted, under oath, that he had not mentioned the $500 to Trustee Porter on November 6 because he had not considered requesting the payment until December 1.[4]

On cross-exam Plaintiff's counsel introduced a November 3, 1992 letter taken from the files of a notebook computer belonging to FTE (Plaintiff's Exhibit 25).[5] In that letter Defendant had included billings for the pledge break he and Ms. Beutler had done in October of that year. Therefore, Defendant *had* requested payment prior to his 341 meeting with the Trustee, yet he failed to mention the expected payment when explicitly asked if he had any accounts receivable.

This deliberate omission is compounded by Defendant's prevarication under oath about what he expected to be reimbursed for the pledge breaks and when he expected the payment. First, Defendant claimed that he did not think the pledge break was a prepetition activity because he assumed his petition

4. The Court notes that even if it found Defendant's explanation believable, it would only explain his failure to mention the account receivable at the November 6 341 meeting of creditors. It would not explain why Defendant failed to mention the $500 on his March 10, 1993 amended petition and schedules.

5. The notebook computer was seized pursuant to a writ of execution obtained by Plaintiff to levy on FTE assets to satisfy its $4 million judgment. Although Defendant's counsel objected to the introduction of Defendant's personal files taken from the computer, he was unable to justify his objection with a relevant rule of evidence. Defendant had ample opportunity to retrieve his personal files before Plaintiff levied on the computer notebook. Moreover, this was a document which could have been produced in response to a subpoena or a request for production of documents pursuant to Fed.R.Civ.Pro. Rule

had been filed on October 7, 1992. Next, Defendant explained that although he may have known that the filing date was actually October 9, thus requiring him to list any accounts receivable on his petition, he did not expect to be paid for the pledge break because he was in bankruptcy and no longer had his television show. Finally, Defendant admitted that he may have known the correct filing date and may have anticipated payment for the pledge breaks but absolutely forgot to ask for his money until December 1, 1992. The evidence presented proves what Defendant's contradictory explanations indicate: Defendant intentionally omitted the expected pledge break payment from both his original and amended schedules and then lied to the Trustee, opposing counsel, and this Court to cover up the omission.

In order to revoke a discharge under 11 U.S.C. section 727(d)(2), Plaintiff must establish that Defendant acquired or became entitled to acquire property of the estate and knowingly and fraudulently failed to report or deliver the property to the Trustee. Both elements of this test must be met and Plaintiff must also prove that Defendant acted with the knowing intent to defraud. *Stewart v. Black (In re Black)*, 19 B.R. 468, 470 (Bankr.M.D.Tenn.1982). The Court finds Defendant's failure to disclose the $500 due him from CMU and his numerous attempts to deceive this Court as to his expectation of payment sufficient to warrant a revocation of discharge under 727(d)(2).[6]

45(a)(1)(C). Because Plaintiff had a legal right to seize the computer and because Defendant could have protected his private files had he been so inclined, the Court overruled Defendant's objection.

6. Some courts have held that fraud may only be the basis for revocation of discharge under § 727(d)(2) if the party opposing discharge had no knowledge of the fraud prior to discharge. "[T]he fact that subparagraphs 727(d)(2) and 727(d)(3) contain no language requiring the knowledge of any fraudulent conduct to be received after the discharge is granted, does not give the party in interest, who has the knowledge of the probable wrongdoing the privilege to wait until after a discharge is granted to ask the court to revoke the discharge." *Canfield v. Lyons, Jr. (In re Lyons, Jr.)*, 23 B.R. 123, 126 (Bankr. E.D.Va.1982). *See also 4 Collier on Bankruptcy*

Plaintiff's second claim of fraud alleges that Defendant fraudulently transferred FTE stock to FTE employee Cathy Beutler shortly before filing for bankruptcy in order to keep the stock from his creditors. On October 8, 1992, the day before Defendant filed Chapter 7, he "sold" all 5,000 share of FTE stock to Beutler for $100. On October 11, 1992 Beutler resigned from FTE, where she had worked for the past ten years. Ms. Beutler's letter of resignation addressed to Fred Trost states that she "relinquish(ed) any and all stocks, bonds, and shares of certificates in Fred Trost Enterprises, Michigan Outdoors TV, Fred Trost Outdoors Club or any other DBA's back to you or to anyone you wish."

Defendant claims he transferred the stock to Beutler on the advice of his attorney. According to Defendant's testimony, his attorney advised him to sell the stock to an employee who could then oversee the liquidation of FTE. Defendant agreed with his attorney's opinion that in light of the $4 million judgment against the corporation the stock was practically worthless. Since Beutler had worked closely with Defendant for many years and knew more about FTE than anyone except the Defendant, he transferred the stock to her because she was best qualified to oversee the liquidation. Defendant's schedules support this testimony. His statement of financial affairs lists a transfer of 5,000 shares of FTE stock to Cathy Beutler for $100.

Beutler's account of the stock transfer differs dramatically from the version relayed by Defendant. According to Beutler, Defendant approached her and asked her to do him a favor by taking the stock for him because he did not want to have any assets when he filed Chapter 7. Defendant told Beutler that she would not have to worry about any liability for the $4 million judgment because he really had no intention of transferring the stock to her. Rather, all she had to do was write him a check for $100, he would immediately give her $100 in cash, and no stock would ever

change hands. The transfer was a sham. At no time did Defendant ask Beutler to exercise any control over the stock or FTE itself. Beutler in fact never saw any stock certificates.

Beutler testified that although she was apprehensive about the transaction, she agreed to write a check to Defendant. The date was October 8, 1992. Beutler's bank records from that day indicate a draft withdrawal of $100.00 and a $100.00 "counter deposit" (Plaintiff's Exhibit 13). Defendant claims that he fully intended for Beutler to oversee the liquidation of FTE. He denies ever giving Beutler $100 in cash in exchange for her check for that amount. When asked who owned the stock after Beutler resigned, Defendant denied any ownership interest. According to his testimony, Defendant believed that because he did not accept the stock, no one owned it. The Court joins Plaintiff in its skepticism of the existence of a "stock limbo".

The only other person to testify to the stock transfer was Joanne Cribley. Ms. Cribley, a current employee of the Practical Sportsman, Mr. Trost's new corporation, had worked with Beutler at FTE. Ms. Cribley testified that when she and Ms. Beutler worked for FTE they would often eat lunch together. She specifically remembered going to lunch with her on October 8, 1992, the day of the alleged stock transaction. Although Ms. Cribley did not recall Beutler using the word "sham" in describing the transfer, she did remember that Beutler was distressed about the transaction that had taken place.

Any discussion of the stock ownership after Beutler's resignation is not pertinent to the Court's analysis, however. The Court finds Beutler's testimony more believable than that of Defendant. Therefore, the Court finds no transfer ever occurred. By listing the transfer of the stock in his schedules, Defendant fraudulently misrepresented its ownership and continued to do so when he

¶ 727.15 (1991). In the Sixth Circuit, there is no authority requiring that Plaintiff have no knowledge of the fraud prior to discharge. Since no evidence was introduced indicating Plaintiff had knowledge of Defendant's failure to disclose the

$500 expected payment prior to the discharge, the Court did not consider the prior knowledge issue in ·its holding that Defendant's conduct merited a revocation of discharge under 727(d)(2).

did not make the necessary correction to his amended schedules.

Defendant's explanations for the stock "transfer" are as numerous and unbelievable as his rationalization for his failure to disclose the $500 owed him for the CMU pledge break. First, Defendant claimed that he "sold" the stock to Beutler on the express advice of his attorney. Generally a debtor who acts in reliance on an attorney's advice lacks the requisite intent to deny discharge of his debts; however, such reliance must be reasonable. *In re Ellingson,* 63 B.R. 271, 276 (Bankr.N.D.Iowa 1986), *In re Adeeb, supra,* at 1343. If true, Defendant's assertion that he only transferred the stock because his attorney told him to could provide a complete defense to fraud. Defendant's attorney at the time of the transfer was Michelyn Pasteur, who by consent of the parties appeared via video deposition pursuant to Fed.R.Civ.P. Rule 30(b)(4). Ms. Pasteur testified that she never advised Defendant to transfer the stock. In fact, Defendant came to her office with the idea of transferring the stock to a friendly third party in order to keep it away from his creditors and refused to change his mind when his attorney counseled him not to do so. In light of Defendant's numerous misrepresentations, the Court finds the attorney's testimony more credible, and therefore more believable, than that of Defendant.

Even if Defendant's attorney had counseled him to transfer or sell the stock, this is not in fact what Defendant did. To reiterate, the Court finds that Defendant never sold the stock to Beutler but misrepresented the actual ownership of the stock in order to keep it out of the hands of his creditors, specifically Buckstop Lure. Testimony revealed why control of the stock, even in light of the $4 million judgment, was essential to Defendant. First, Defendant believed that ownership of the stock was necessary to appeal the defamation judgment as to Defendant FTE. In his own personal notes entitled "Steps toward liquidation" (Plaintiff's Exhibit 21), Defendant revealed his understanding of the importance of owning the stock.

Before Trost's bankruptcy, Cathy Beutler is willing to buy FTE for $100 and become president and executive officer of FTE, handling the final disposition of assets over the next few years. The mailing list will be the prime income source, and money from the list will be used to make payments to creditors and the basic overhead costs. Keeping FTE alive for the next two years—despite collection attempts by Buck Stop—is important to maintain the appeal.

If Defendant had listed the stock in his schedules as an asset of his estate instead of as a completed transfer to Beutler, the Chapter 7 trustee would have offered it for sale as an asset of Mr. Trost's estate, Plaintiff would have been able to purchase it, and remove Defendant as an officer of FTE, thus thwarting any attempt of an appeal. This avenue should have been available to them but was not because Buckstop believed that Defendant had transferred the stock to Beutler based on representations made in Defendant's schedules.[7] Instead, Plaintiff was forced to engage in a costly, timely battle to acquire the assets of FTE. Amazingly, at the time of trial, Defendant was still talking about appealing the defamation judgment as to FTE and told the Court his attorney had in fact filed such an appeal. Mr. Trost's trial counsel did not know of an appeal, nor did counsel for Plaintiff. Both counsel and the Court made a joint inquiry to the Michigan Court of Appeals and learned that no appeal had been filed and that the statute of limitations for doing so had long since run.

Control of FTE stock was also necessary to maintain ownership of the name "Michigan Outdoors" which was a valuable asset of the corporation. In 1983 Defendant was involved in a bitter legal battle over the name "Michigan Outdoors" with his then and present nemesis, Michigan United Conservation Club (MUCC). In 1983, MUCC was publishing a magazine under the name, "Michigan

---

7. If the stock had been transferred to Beutler for $100.00, the trustee might have sought to recover it as a fraudulent transfer pursuant to 11 U.S.C. § 548. The relevant issue would then have been the value of the FTE stock. However, this issue is extraneous to the one presently before the Court.

Out of Doors." The parties eventually settled their differences out of court, agreeing that Defendant could utilize the name, but only if he used "Fred Trost's Michigan Outdoors." The 1983 legal altercation created an antagonistic relationship between FTE and MUCC that continues to this very day. John Ford, III and Douglas Tabor, two of Defendant's current employees, testified to the hostilities between Defendant Trost and Tom Washington of MUCC. The other ostensible purpose for their testimony was to attest to Mr. Trost's reputation for truthfulness pursuant to FED.R.EVID. 608(a). Their testimony, however, must be viewed in light of the fact that they are, and presumably hope to remain, employees of the Defendant. Also, any weight given this testimony would necessarily be tempered by the Court's assessment as to Mr. Trost's honesty and truthfulness based on his one day of testimony in this matter. The Court has found Defendant less than credible in almost every aspect of this case. Bankruptcy Rule 8013 provides that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *See also In re Caldwell,* 851 F.2d 852 (6th Cir.1988).

Based on the testimony of Ford and Tabor, the Court finds that Defendant had a personal stake in seeing that someone friendly kept control over the stock to ensure that MUCC did not gain control over it. That "someone friendly" was himself.

Defendant also had a financial stake in the name "Michigan Outdoors." Ultimately the name was auctioned at a public sale in March of 1993 and brought the highest price of any single FTE asset. The highest bidder, MUCC, paid $15,500. Prior to the auction Defendant had attempted to transfer the name to his son Zachary's corporation, ZNT Marketing. However, the Montcalm County Circuit Court ordered the name "Michigan Outdoors" transferred back to FTE. Even after the auction Defendant refused to deliver "Michigan Outdoors" to MUCC peacefully. On March 24, 1993 Defendant sought a temporary restraining order in the Federal District Court of the Western District of Michigan, seeking to prevent MUCC from using the name. Defendant was not successful.[8]

In view of the tremendous import of controlling FTE stock in the preceding examples, it is quite clear that the value of the stock was anything but worthless. Defendant's failure to reveal his ownership in both his original and amended schedules and his claim that Beutler was the owner of the stock caused Plaintiff significant expenditures of time and money. It also constituted fraud in fact on this Court.

■ In order to revoke a discharge under 727(d)(1) Plaintiff must prove that Defendant committed fraud in fact, not fraud in law or implied fraud. *In re Albers,* 80 B.R. 414 (Bankr.N.D.Ohio 1987). Fraud must be proven in the procurement of discharge and sufficient grounds must have existed which would have prevented the discharge had they been known and presented at the time. *Miller v. Ping (In re Ping),* 96 B.R. 96 (Bankr. E.D.Ky.1988). Plaintiff has succeeded in proving that Defendant committed fraud in fact by asserting he had sold the FTE stock to Cathy Beutler when in fact he had maintained ownership in hopes of preserving his right to appeal and keeping the "Michigan Outdoors" name from MUCC. The fraud existed in January of 1993 when this Court granted Defendant a discharge. If the Court had known Defendant had committed the fraud, it surely would not have allowed the discharge.

Plaintiff must also prove that it was unaware of the fraud at the time discharge was granted. *In re Hall,* 84 B.R. 472 (Bankr. N.D.Ohio 1987), *Brown v. Barley (In re Barley),* 130 B.R. 66 (Bankr.N.D.Ind.1991). De-

---

8. The Court found it interesting to note the tremendous power Defendant sought on behalf of FTE while denying that he owned any of its stock. When asked to account for this anomaly, Defendant claimed that he was acting as an officer of the corporation. He was unable to explain how he had been reelected during the past year when according to his own testimony, no one owned the stock. Of course this line of questioning is only relevant to prove the lengths Defendant was willing to go in order to perpetuate his fraud before this Court. As has previously been determined, Defendant never relinquished his ownership of the stock.

fendant moved for a directed verdict on this issue at the close of Plaintiff's case, claiming that Plaintiff had known about a possible fraudulent stock transfer on December 4, 1992.[9] On that date Trustee Porter had discussed the "fair value" aspects of the stock transaction with Plaintiff's counsel. As a result of that meeting the Trustee stated that "something irregular had occurred." Although Plaintiff may have suspected a fair value problem pursuant to 11 U.S.C. § 548 prior to Defendant's discharge, Plaintiff proved at trial that it did not know that the stock transfer itself was a sham until the beginning of February when, after receiving a letter of inquiry from the Trustee, Beutler contacted Plaintiff's counsel to explain the substance of the "transfer". The Court denied Defendant's motion for a directed verdict and now holds that Plaintiff did not know there had been no transfer at or prior to the January 6, 1993 discharge order.

Plaintiff has shown by a preponderance of the evidence that Defendant fraudulently listed the transfer of FTE stock on his schedules in an attempt to keep control of the stock from Plaintiff and rival MUCC. Further, Plaintiff has proven that it did not know of such fraud until well after January 6, 1993, the date this Court granted Defendant's discharge.

Defendant's behavior in this case has been truly remarkable and fully deserving of the exceptional remedy of revocation of discharge. A debtor who seeks relief under the bankruptcy laws must be candid with the system. Bankruptcy is a remedy based in equity. A debtor is required to be fair and honest with the Court and make full and accurate disclosure in all of the documents filed with the Court. The Defendant did not do this. This is not a case which presents one or two minor mistakes that might be written off as oversights, but instead is one showing a calculated pattern of deception designed to mislead the Court and manipu-

late the bankruptcy process for the debtor's own benefit to the detriment of his creditors.

It is quite clear that well before voluntarily seeking the relief that bankruptcy offers, Mr. Trost disseminated to others his written expression of his disdain for both the bankruptcy process and the bankruptcy court (Plaintiff's Exhibit 11). Having concluded two days of trial in this case, it is evident that this written expression was not just a fleeting thought but rather a prescient indication of how Defendant intended to conduct his affairs during his bankruptcy. It appears that Mr. Trost has now been hoisted by his own petard.

A separate order will be issued in conformity with this opinion.

---

**9.** Although the Court initially opined that a motion for directed verdict may not be the proper terminology in a nonjury trial, subsequent research indicated that Defendant's counsel was indeed correct in phrasing his oral motion made at trial. Pursuant to the Committee Notes to the 1991 amendments to FED.R.CIV.P. Rule 52(c), Rule 52(c) parallels Rule 50(a) but is applicable to nonjury trials. We conclude that the proper motion in a nonjury trial is one for a directed verdict, or even more appropriately, for a judgment as a matter of law, not for a motion to dismiss as under former FED.R.CIV.P. 41(b).