**In re Joseph John VENTIMIGLIA, Debtor.**

**Paul BOROCK, Trustee, Plaintiff,**

v.

**Diane TELESZ and Joseph John Ventimiglia, Defendants.**

**Bankruptcy No. 93–41735–R.**

**Adversary No. 95–4638.**

United States Bankruptcy Court, E.D. Michigan.

July 1, 1996.

---

Nancy A. Nihem, Dougherty, Schneider & Miller, P.C., Detroit, Michigan, for Plaintiff.

Thomas J. Budznski, Clinton Township, Michigan, for Defendants.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

The Trustee in this chapter 7 case filed this adversary proceeding to avoid transfers by the Debtor to Diane Telesz, his fiancee/companion, and to revoke the Debtor's

discharge pursuant to section 727(d)(1) of the Bankruptcy Code. The principal witnesses were the Debtor, Joseph Ventimiglia, and Mrs. Telesz (collectively the "Defendants"). The case was tried on February 27 and 28, 1996. This is a core proceeding under 28 U.S.C. § 157(b)(2)(E), (H), and (O). The following sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

The Debtor filed his chapter 7 petition on February 17, 1993. His schedules show total assets of $75, consisting of $25 in clothing and $50 in hand tools, total debts of $129,-645.36, monthly income of $800, and monthly expenses of $225. His statement of financial affairs shows yearly income of $8,000 in each of 1991 and 1992. His schedules indicate that the Debtor had been in business for 42 years. The Trustee alleged in this adversary proceeding that the Debtor's remarkable dearth of assets after 42 years of work was the result not only of financial and business misfortune but also of fraudulent conveyances to Mrs. Telesz and the Debtor's failure to make complete and honest disclosures in his schedules.

### Facts

Despite nearly two days of trial, four or five depositions, and numerous exhibits, some relevant facts remain murky. This is due principally to the alleged loss of all of the Debtor's significant business and personal records in a "flood" at some point prior to the filing of his case and to the fact that the Defendants' testimony was often contradictory, unclear, and generally unreliable because of the Debtor's hostile and combative attitude and the Defendants' willingness to distort the truth. Nevertheless, by the end of the testimony, the Debtor's financial and business situation and the reasons for his transfers to Mrs. Telesz emerged with reasonable clarity.

The Debtor was a self-employed builder who made his living by contracting with home owners for renovations or additions. By the fall of 1989 the Debtor was experiencing serious complaints about his work. By the end of 1990 disgruntled home owners had filed complaints against him with the Michigan Department of Licensing and Regulation, a small claims court action in Sandusky District Court, and a lawsuit in St. Clair Circuit Court. On August 1, 1991, the St. Clair Circuit Court rendered a default judgment against the Debtor in the amount of $26,602.13. All of these complaints were premised upon breach of contract and poor workmanship, much of which the Debtor acknowledged but blamed upon his subcontractors or others working for him. One day after the St. Clair Circuit Court judgment was entered, the Debtor transferred his property at 3138 Military Street in Port Huron, Michigan, (the "Military Street Property") to Mrs. Telesz by a handwritten quitclaim deed reciting a one dollar purchase price. The Debtor's transfer of the Military Street Property did not affect his occupancy or control of that property.

During much of the period since 1989 the Debtor has lived with Mrs. Telesz in her home at 2858 Military Street (the "Telesz Property"). Mrs. Telesz is a long-time Ford employee who now earns approximately $50,-000 a year and derives substantial income from the rental of part of the Telesz Property, land contract payments from the sale of her former home, and pension and other payments arising from her husband's death in 1979. At the time of trial, she owned five vehicles, at least one of which was used by the Debtor.

The Military Street Property adjoins the St. Clair River, which may have contributed to the flooding that allegedly destroyed the Debtor's records stored in the basement. The flooding, however, was not caused by the river overflowing its banks but by the failure of a sump pump. The Defendants could not be pinned down on the date of the flooding or how much destruction it caused. The only certainty from the Defendants' testimony was that the flooding was late enough, and was sufficiently severe, to have destroyed whatever records the Trustee sought.

The Debtor continued to make mortgage and other payments on the Military Street Property after its transfer to Mrs. Telesz. He continued to maintain his office and records there. He paid no rent to Mrs. Telesz

and she did not rent any part of the Property to third parties, as she did in the case of the Telesz Property. In short, there is nothing in the record to suggest that the transfer had any economic reality except for her alleged payment of $60,000 and the bill of sale evidencing that payment.

According to the Defendants, Mrs. Telesz paid for the Property with $60,000 of cash she had stashed in her safe. She testified that the $60,000 was part of a $65,000 to $67,000 fund she had accumulated out of a fear and distrust of banks inculcated by her parents' traumatic experiences during the Great Depression. This appears to be a quite selective fear and distrust since Mrs. Telesz maintains a substantial number of bank accounts. She testified that it was her practice to cash her checks from Ford, spend what was needed on food and other living expenses, and put the rest in the safe. This haphazard treatment was at odds with the careful attention to detail that appeared to characterize her other business and financial transactions. There is no record of what the Debtor did with the cash. He testified that he immediately paid a good deal of it to disgruntled home owners, but that he could not identify the homeowners or the amount distributed because the flood had destroyed his records. He said he put the balance in his freezer.

According to the Defendants, this transfer allegedly took place in the Telesz Property without fanfare or formality but in the presence of the Debtor's son and daughter, who helped count the money. The daughter testified that she did not count all the money or otherwise participate in the transaction although she was present when the alleged payment was made. According to her, she was helping to clean the house. She was uncertain as to the date or even the year on which the cash was supposedly transferred. On the whole, her testimony did little to buttress the Defendants' story. The only other support for the $60,000 cash payment story is a bill of sale in Debtor's handwriting dated the transfer date. The bill of sale surfaced for the first time in 1995 long after the transfer had been in contention.

The next matter that provoked the Trustee's concern, and is the centerpiece for his request that the Debtor's discharge be revoked, is a Michigan National Bank account (the "MNB Account") which Mrs. Telesz opened and maintained for the Debtor's benefit beginning in 1990 until sometime after this case was filed in 1993. It appears that the Debtor ran his income and expenses through this account except for those which he handled on a strictly cash basis. The Trustee presented copies of the statements for the MNB Account for the period of April 16, 1992 through December 17, 1992. The total deposits made to the MNB Account during that period were $103,000. The two largest deposits into the account were made in connection with work for homeowners named Smith, one for $12,000 on September 7, 1992, and the other for $17,900 on October 29, 1992.

The MNB Account was not disclosed in the Debtor's chapter 7 schedules and it is not clear when it surfaced. The Defendants initially denied that any such account existed. Mrs. Telesz explained that she failed to tell the truth about the account because her denial was made when she was in the midst of a fee dispute with her lawyer and thus did not consult him on whether or not to tell the truth. She testified that she finally admitted that the account existed because it was "going to come out sooner or later" and it had become impossible to use the account without discovery by the Court. It appears that the parties were careful and businesslike in limiting the MNB Account to the Debtor's funds. There is no evidence that the Debtor's funds were commingled in the MNB Account with funds of Mrs. Telesz. The Debtor signed Mrs. Telesz's name on most of the checks drawn on the MNB Account.

The Trustee also claims that he is entitled to turnover of a small property located in Kimball, Michigan (the "Kimball Property"), which was purchased in Mrs. Telesz's name on September 9, 1992. The Trustee bases his claim to this property on the fact that the Debtor, and not Mrs. Telesz, initiated the transaction, did most of the negotiating with the sellers, drafted the deed for the sellers, and, most importantly, transferred $4,500,

the purchase price for the Kimball Property, from the MNB Account to Mrs. Telesz within days of the property transfer. Although the Defendants attempted to characterize this payment, which was made in two checks of $2,000 and $2,500 dated September 14 and September 17, 1992, as repayment of a loan by Mrs. Telesz to the Debtor, their story was not credible. The circumstantial evidence indicates that the Debtor bought and is the beneficial owner of the Kimball property, but named Mrs. Telesz as the owner of record in order to disguise the Debtor's interest from his creditors.

### Analysis

The Trustee bases his right to compel Mrs. Telesz to turn over to him the Military Street Property on Section 544(b) of the Bankruptcy Code. This section provides:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

According to the Trustee, the Debtor's transfers violated the Uniform Fraudulent Conveyance Act, M.C.L. § 566.11 *et seq.* (the "Fraudulent Conveyance Act"). The Fraudulent Conveyance Act provides:

> **Sec. 4. Conveyances by Insolvent.** Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

> **Sec. 5. Conveyances by Persons in Business.** Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without ·regard to his actual intent.

> **Sec. 7. Conveyance Made With Intent to Defraud.** Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

 Section 548 of the Bankruptcy Code includes similar provisions for avoiding fraudulent conveyances, but section 548 is applicable only to transactions made within the year preceding the bankruptcy filing. However, the Michigan Uniform Fraudulent Conveyance Act is applicable to transfers made within the six years preceding the date an action is brought to avoid them. M.C.L. 600.5813. It appears from the claims record that the Debtor had creditors at the time of the transfer of the Military Street Property in 1991 and thereafter who had allowable claims against the Debtor in his chapter 7 case. Therefore, the Trustee is entitled under section 544 of the Bankruptcy Code to employ Michigan law to avoid fraudulent conveyances.

 Section 4 of the Fraudulent Conveyance Act proscribes conveyances made without fair consideration where the debtor is, or will be rendered, insolvent, without regard to whether the debtor intended to hinder, delay, or defraud his creditors. The first question is whether Mrs. Telesz paid fair consideration for the Military Street Property. The Trustee has the burden of proving lack of fair consideration by a preponderance of the evidence. *Webster v. Barbara (In re Otis & Edwards, P.C.),* 115 B.R. 900, 910–11 (Bankr.E.D.Mich.1990).

 The Debtor testified that he purchased the Military Street Property in either 1987 or 1988 for $60,000. He insisted this purchase price was correct but could not explain why it differed from the $64,600 figure he had given in his deposition testimony. At the time of the transfer to Mrs. Telesz the property was subject to a $30,000 mortgage to St. Clair County Manufacturers Credit Union securing loans made to the Debtor in

February 1991. The quit-claim transfer to Mrs. Telesz was subject to this mortgage, which meant that the property would have to have been worth at least $90,000 to have justified a $60,000 cash price.

There is little or no competent evidence in the record to support a finding that $60,000 would not have been fair consideration for the transfer of the Military Street Property to Mrs. Telesz. The Credit Union obtained an appraisal showing that the property had a value of $96,000 at the time the Debtor obtained the $30,000 mortgage. That appraisal was excluded as hearsay. Even if it had been admitted, it is not so out of line with a $90,000 value at the date of transfer to Mrs. Telesz as to justify a finding that, had the $60,000 been paid, there would not have been fair consideration. So the Trustee can prevail under section 4 only if the $60,000 was not paid.

While it is difficult to prove a negative, the circumstantial evidence presented by the Trustee is persuasive in proving that no such payment was made. The Military Street Property was transferred on the day after the entry of the $26,000 default judgment against the Debtor and at a time when the Debtor was struggling with other lawsuits and complaints to the Michigan Department of Licensing and Regulation, which ultimately resulted in revocation of his builder's license. The Debtor had an obvious incentive to put his property beyond his creditors' reach, if he could do so. There is no evidence that the Debtor needed cash at that point or used any cash to pay the default judgment or any of his other creditors. Even if the Debtor's excuse that his records had been destroyed by the flood were accepted at face value, it is improbable that the Debtor would not have a clearer more coherent recollection of what the $60,000 was used for or why it was needed, if it had in fact been paid.

All that the Defendants have to counter the Trustee's circumstantial evidence is an implausible, not to say incredible, story that seems designed more to be unverifiable than to be believable and whose only tangible support is a bill of sale in the Debtor's handwriting which surfaced long after the issue of

the transfer was raised. Moreover, it is a story that appears to belie the care the Defendants took in maintaining the MNB Account and Mrs. Telesz's scrupulousness in accounting for her own rather complex financial affairs. Furthermore, it depends upon the credibility of Mrs. Telesz, who admittedly lied about the MNB Account, and the credibility of the Debtor, who was frank to acknowledge that he had lied about the consideration paid in this and other transactions in order to avoid transfer taxes and whose demeanor, on the whole, appeared designed to frustrate any effort to elicit information about his assets, liabilities or circumstances. Finally, the daughter's testimony supporting the $60,000 payment appeared designed to provide some support for the Defendants' story while distancing herself from it as much as possible and was not credible. Therefore, the Court finds that the transfer of the Military Street Property to Mrs. Telesz was made without fair consideration under section 4 of the Fraudulent Conveyance Act.

██ The next question is whether that transfer was made while the Debtor was insolvent or rendered the Debtor insolvent under section 4 of the Fraudulent Conveyance Act. The evidence shows that at the time of its transfer the Military Street Property was the Debtor's only substantial asset. Between the time of that transfer and the date he filed his chapter 7 petition, which showed assets having a value of $75, there is no record or testimony of any significant acquisition or disposition of property by the Debtor other than the cash receipts of his business. Although the Debtor received net cash in the amount of $14,389.73 upon refinancing the Military Street Property in February 1991, there is no indication that he retained all or any substantial part of that sum in August when he transferred the property to Mrs. Telesz.

During that period the Debtor was struggling to fend off the claims of disgruntled home owners as well as to pursue his business. In his statement of financial affairs he certified that his gross income in 1991 (and 1992 as well) was only $8,000. Although the accuracy of these numbers is suspect, they

reinforce the notion that the Debtor's business was in trouble, that he was losing money, and that he had no other significant assets on August 2, 1991, except the Military Street Property. Of course one cannot entirely rule out the possibility that the Debtor had squirreled away additional cash or assets which he neither disclosed nor reported. However, the Trustee was not obliged to rule out this possibility in order to prevail under section 4 of the Fraudulent Conveyance Act. *See Otis & Edwards, P.C.,* 115 B.R. at 911.

■ The Trustee also alleged that the transfer violated section 5 of the Fraudulent Conveyance Act because it left the Debtor with an unreasonably small capital to continue his business. The testimony as to the scope and nature of the Debtor's business during this period was contradictory and uncertain. On the one hand, the Debtor testified that his activities were limited by hip replacements. On the other hand, he claimed to need and expend substantial funds to keep the business going and to deal with the mistakes of his subcontractors, and the MNB Account reflects gross income in excess of $100,000 from April through December, 1992. However, the Trustee presented insufficient evidence as to the nature and extent of the capital requirements of the Debtor's business or undertakings to justify avoidance under section 5.

■ The evidence does justify the conclusion that the transfer of the Military Street Property was made by the Debtor under section 7 with the actual intent to hinder, delay, or defraud creditors. The Trustee had the burden of proof on this issue by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Buckstop Lure Co. v. Trost (In re Trost),* 164 B.R. 740, 744 (Bankr. W.D.Mich.1994). Under the authorities the Court is directed to ascertain the Debtor's intent in reference to badges of fraud, which in *Otis, supra,* are stated as follows:

(a) [Close] relationship between the debtor and the transferee.

(b) Lack of consideration for the conveyance.

(c) Insolvency or indebtedness of the debtor.

(d) The transfer of the debtor's entire estate.

(e) Reservation of benefits, control or dominion by the debtor.

(f) Secrecy or concealment of the transaction.

(g) Pendency or threat of litigation at the time of the transfer.

*Otis & Edwards, P.C., 115 B.R.* at 913 (citations omitted). All of the badges of fraud in *Otis* are present in this case except, arguably, (f), relating to secrecy or concealment. The Defendants recorded the quit-claim deed in the public records; but since the apparent motive for the transfer was to insulate the Military Street Property from the $26,000 default judgment and other claims, it was necessary to perfect the transfer by recording. Therefore, the Court finds that the transfer of the Military Street Property was made by the Debtor, and received by Mrs. Telesz, with the intent to hinder, delay, and defraud the Debtor's creditors under section 7.

■ The Trustee also framed his effort to reclaim the Kimball Property, or its value, as a fraudulent conveyance. His circumstantial evidence that the Kimball Property was purchased with the Debtor's funds is persuasive. The only evidence that tends to support the Defendants' contention that the property was bought by Mrs. Telesz for her benefit was her testimony that it was used to store her son's implements in his gardening business. From the evidence it appears that the Debtor initiated negotiations for the purchase of the Kimball Property, took the lead in those negotiations, and drafted the documents to close the transaction.

Most importantly, the Defendants withdrew $4,500 from the MNB Account and paid it to Mrs. Telesz contemporaneously with Mrs. Telesz's Purchase of the Kimball Property. The Defendants attempted to explain away this fact by ascribing the $4,500 transfer to repayment of a $5,000 loan which Mrs. Telesz had made to the Debtor, but their story was not persuasive. They offered no credible explanation of the $4,500 payment if the loan to the Debtor were $5,000. They

offered no evidence of a pattern of payments to Mrs. Telesz from the MNB Account which would make their explanation that the $4,500 payment to Mrs. Telesz and the contemporaneous $4,500 purchase of the Kimball Property were merely a coincidence more credible. Moreover, the fact that the payment for the Kimball Property was $4,500 was established by the testimony of the sellers, not the Defendants. The deed drafted by the Debtor showed a purchase price of $4,000, not $4,500. Therefore, the Court finds and holds that the Debtor was intended to be and is the beneficial owner of the Kimball Property and that Mrs. Telesz was intended only to hold legal title to protect the Debtor's interest from his creditors. Under these circumstances, the Kimball Property is property of the estate under section 541(d) and should be turned over to the Trustee.

■ The Trustee also contends that some or all of the Debtor's deposits into the MNB Account were fraudulent conveyances to Mrs. Telesz and that she should be ordered to pay to the Trustee the amount of such deposits. Although the Plaintiff focused on the $29,000 deposits made in connection with the Smith contract and suggested that these might be carved out as fraudulent conveyances, no rationale was given for this classification. On the evidence presented either all of the $103,000 in deposits were fraudulent conveyances or none were.

According to the testimony the MNB Account was opened in 1990 or 1991 and remained open and active at the time this case was filed on February 17, 1993, and thereafter. No evidence was presented on the activity in the MNB Account prior to April 16 or after December 17, 1992, although any deposits made into the MNB Account prior to the date the Debtor filed his petition in this case would presumably have been fraudulent conveyances to Mrs. Telesz on the Trustee's theory.

The MNB statements reveal that the Debtor was actively pursuing his contracting business during most of the April–December 1992 period but that his activity probably started to decline in November 1992. In any event, the evidence provides no basis to suppose that the MNB Account exceeded a few thousand dollars in February 1993, when the Debtor filed this case. There is no evidence that Mrs. Telesz used any funds from the MNB Account for her own benefit or that she commingled her own money with the Debtor's money in the MNB Account. The MNB Account was the Debtor's account, not Mrs. Telesz's. Therefore, although the Trustee proved that the MNB Account belonged to the Debtor, he failed to prove that deposits into the MNB Account constituted conveyances to Mrs. Telesz.

■ To the extent that the MNB Account was used by the Debtor after his case was filed, it appears that he would be responsible for the return of such funds. However, the Trustee did not request this relief and the extent of the Court's turnover order in respect of the MNB Account is limited to the cash, if any, remaining in that account.

■ Finally, the Trustee has requested revocation of the Debtor's discharge under section 727(d)(1) on the ground that his discharge was obtained through fraud. Section 727(d)(1) of the Bankruptcy Code provides:

On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge.

Although the Trustee bases his case for revocation of the Debtor's discharge primarily on the Debtor's failure to disclose his interest in the MNB Account, he also cites other deficiencies in Debtor's papers. These include his failure to disclose his liability on the mortgage on the Military Street Property, the flood which destroyed his records, and the various expenses in his statement of financial affairs.

■ Revocation of discharge is usually characterized as an extraordinary remedy that should not be lightly granted. *See Buckstop Lure Co. v. Trost (In re Trost),* 164 B.R. 740, 743 (Bankr.W.D.Mich.1994). A

paramount purpose of bankruptcy is to afford the debtor a fresh start in life free from the burden of overwhelming debt. To prevail, the Trustee must not only show the requisite fraud but must show that he did not know of such fraud prior to the Debtor's discharge. The Trustee must prove both criteria by a preponderance of the evidence. *Id.*, at 744.

Based on the record and the evidence at trial, the Trustee's complaints about the omissions in the Debtor's statement of financial affairs are well taken, but are of themselves insufficient to justify revocation of the Debtor's discharge. The Trustee failed to prove that prior to the Debtor's discharge he lacked knowledge of the flood that allegedly destroyed the Debtor's records. The Trustee knew, or should have known, that the Debtor had few if any business records despite having been a builder for 42 years, since the Debtor indicated as much in his schedules. His section 341 examination should have dramatized the Debtor's lack of records. Although the Debtor's disclosure of the flood in his schedules might have provoked inquiry by the Trustee, which would have elicited evidence of fraud, that possibility is too speculative to justify revocation of the Debtor's discharge.

It does appear that the Trustee had no reason to suspect that the Debtor was personally obligated on a $30,000 mortgage prior to Debtor's discharge. However, it is difficult to characterize the Debtor's failure to list that mortgage obligation as fraudulent or to perceive how its omission affected the Trustee or the Debtor's creditors. The mortgage was a first claim on the Military Street Property, which was worth at least three times the amount of the mortgage. Therefore, as a practical matter, the Debtor's liability was technical only and would not have resulted in a real claim.

The Debtor's failure to disclose his automobile and other expenses dramatizes the fact that the Debtor's schedules and statement of financial affairs contained serious omissions and misstatements. But, here again, the statement of affairs was so deficient on its face that it is questionable whether the Debtor's failure to disclose his ex-penses was fraudulent or would have alerted the Trustee to fraud.

However, the MNB Account stands on a different footing. Here, the evidence is persuasive that the Trustee did not know of this account prior to the Debtor's discharge. Both the Debtor and Mrs. Telesz attempted to keep the MNB Account secret until after the Debtor's discharge. Although the evidence does not show the balance in the MNB Account at the time of filing, it does show that the Debtor continued to utilize the MNB Account to evade claims of the Debtor's creditors until well after the case was filed.

The establishment and maintenance of the MNB Account and the Defendants' willingness to lie to keep it secret are unambiguous proof of the Debtor's intent to mislead his creditors, to avoid their claims, and of Mrs. Telesz's complicity in that scheme. Under the circumstances of this case, this action, had it been known to the Trustee, would have been the basis for objection to Debtor's discharge under section 727(a)(2) and probably (3) of the Bankruptcy Code. For that reason the Debtor's discharge should be revoked.