In re Barbara Jo Young HENDREN, a/k/a Barbara Jan a/k/a Barbara Y. Hendren, Debtor.

The FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,

v.

Barbara Jo Young HENDREN, a/k/a Barbara Jan Hendren, a/k/a Barbara Y. Hendren, Defendant.

Bankruptcy No. 3–84–00309.
Adv. No. 3–84–0249.

United States Bankruptcy Court,
E.D. Tennessee.

July 17, 1985.

Rodney D. Ray, Michael L. Powell, Knoxville, Tenn., for plaintiff.

Margaret P. Walls, Robert L. Cheek, Knoxville, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

Plaintiff Federal Deposit Insurance Corporation (FDIC) challenges the debtor's right to a discharge and alleges as grounds for denial 11 U.S.C.A. § 727(a)(2)(A), § 727(a)(4)(A) and § 727(a)(5) (1979).[1] Trial

---

**1.** (a) The court shall grant the debtor a discharge, unless—

. . . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed,

was held January 8, 1985. On February 20, 1985, the debtor moved to reopen the hearing for further proof. This motion was granted on March 7, 1985, and additional proof, limited to § 727(a)(5), was received April 2, 1985.

FDIC is the holder of certain obligations payable by the debtor by virtue of FDIC's acquisition of those assets after First Security Bank in Erwin, Tennessee, and Watauga Valley Bank in Elizabethton, Tennessee, were closed by the Commissioner of Financial Institutions on April 6, 1984.

FDIC's objections may be summarized as follows:

a. the transfer of approximately $122,-000.00 worth of personal property to various family members after October, 1983, and the cancellation of a $20,000.00 note receivable from one of her sons in November, 1983, in violation of § 727(a)(2)(A);

b. discrepancies in the debtor's testimony at two § 341 meetings, in violation of § 727(a)(4)(A);

c. the debtor's failure to adequately explain the disposition of the proceeds of various loans to her and her family members, as well as the disposition of certain articles of jewelry and marketable securities, in violation of § 727(a)(5).

Plaintiff's Proposed Findings of Fact and Conclusions of Law, at 2 (filed February 22, 1985).

## I

The debtor, Barbara Hendren, filed a voluntary petition under Chapter 13 of the United States Bankruptcy Code on February 24, 1984, and a meeting of creditors was held pursuant to § 341 on March 26, 1984. The debtor subsequently filed a motion pursuant to 11 U.S.C.A. § 1307(a) to

convert her case to one under Chapter 7 and a second meeting of creditors was held on May 25, 1984. The debtor testified under oath at both hearings.

It does not appear from the record in this case that the debtor ever engaged extensively in business operation. In her chapter 13 statement she indicated her present employment was that of a secretary. The record does indicate that in October 1983 she had an interest in Lee's Robo car wash in Erwin. *See infra* II.2.C.

The court has carefully reviewed the mass of material introduced in this proceeding, including pleadings, briefs, depositions, stipulations, amended stipulations and exhibits. The debtor's admitted failure to keep adequate books and/or records reflecting her financial transactions and bank borrowings has compounded the court's task. After two trials and a review of the testimony and exhibits the debtor concedes: "It is still unclear … as to exactly how much money debtor had borrowed from the plaintiff [FDIC as successor to First Security Bank and Watauga Valley Bank] and other banks, in the years of 1977 through 1983. The amounts, however, are somewhere between $520,000.00 to $580,000.00." Defendant's Supplemental Proposed Findings of Fact and Conclusions of Law, at 1–2 (filed May 6, 1985).

## II

### *Failure to Explain Loss of Assets Under § 727(a)(5)*

1. At trial, January 8, 1985, plaintiff introduced the testimony of a bank examiner, Barnes, which indicated that approximately $312,538.14 loan proceeds from two banks had gone to the debtor either directly or indirectly during the years 1980, 1981, 1982, and 1983. The examiner's testimony

---

mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
(A) property of the debtor, within one year before the date of the filing of the petition;

 . . . . .

 (4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

 . . . . .

 (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities….

11 U.S.C.A. § 727 (1979).

was based upon his review of First Security Bank's and Watauga Valley Bank's internal records. His testimony indicated that the debtor had either received proceeds checks from various loans or that when the debtor's relatives became obligated on certain notes which she had co-signed, the proceeds went to pay off prior obligations in her name. Mr. Barnes's testimony was founded on certain exhibits submitted in conjunction with a Request for Admissions filed by plaintiff on November 27, 1984, and answered by defendant on December 11, 1984. An itemization of Barnes's testimony, by exhibit, is as follows:

A. Exhibit B (promissory note dated October 31, 1983, in the principal amount of $90,107.07 payable to First Security Bank, signed by Rose Young (debtor's mother)[2] and Barbara Hendren) paid off a prior loan to the debtor for $76,000.00, which was disbursed as follows:

(1) $6,000.00 disbursed January 16, 1982, which was deposited in the debtor's bank account.

(2) $17,000.00 deposited to the debtor's bank account on November 13, 1980.

(3) $35,000.00 disbursed on April 21, 1981, which was deposited in the debtor's checking account at United American Bank in Johnson City.

(4) $18,000.00 disbursed on February 28, 1981, to the debtor's son, Lee, and negotiated at Valley Federal Savings & Loan after the debtor endorsed the proceeds check.

B. Exhibit C (promissory note in the principal amount of $50,000.00 to Watauga Valley Bank, signed by Rose Young, Barbara Hendren, and Joe Hendren) renewed a $55,000.00 obligation incurred by the debtor on September 24, 1981. The proceeds of this loan were disbursed to the debtor on September 23, 1981, and negotiated at United American Bank in Washington County.

C. Exhibit E (promissory note in the principal amount of $6,500.00 signed to First Security Bank by Barbara and Jody Hendren) was a renewal of an obligation incurred on January 19, 1980. The debtor received the proceeds check for the loan and negotiated it at Valley Federal Savings and Loan.

D. Exhibit F (promissory note in the principal amount of $6,800.00 to First Security Bank, signed by Barbara and Jody Hendren). The proceeds check for this loan was given to Jody Hendren on April 13, 1982, endorsed by the debtor and deposited in a Merrill Lynch account in Johnson City.

E. Exhibit G (promissory note in the principal amount of $20,000.00 to First Security Bank, signed by Lee and Barbara Hendren). The loan was originally disbursed on March 15, 1982, by a proceeds check to Lee Hendren, endorsed by the debtor, and deposited in a Merrill Lynch account in Johnson City.

F. Exhibit I (promissory note in the principal amount of $6,900.00 to First Security Bank signed by Barbara and Lee Hendren and an undisclosed third party). Six thousand dollars ($6,000.00) of these funds were eventually placed in the debtor's bank account on November 4, 1982, along with $3,000.00 from Jody Hendren and $500.00 from an unknown source.

G. Exhibit J (promissory note in the principal amount of $18,669.57 to First Security Bank, signed by Rose Young and Barbara Hendren) was a renewal of a $27,000.00 obligation. The proceeds of this loan were disbursed as follows:

(1) $10,000.00 check to Barbara Hendren on January 27, 1981.

(2) $7,000.00 check to Barbara Hendren on January 27, 1981.

(3) $10,000.00 paid off on February 6, 1981, a prior loan to Barbara Hendren.

H. Exhibit K (promissory note in the principal amount of $12,683.16 to First Security Bank, signed by Rose Young and Barbara Hendren). The proceeds of this loan were paid by two $5,000.00 cashier's checks dated January 15, 1983. Both

**2.** Rose Young filed a chapter 7 bankruptcy petition on February 24, 1984.

checks were endorsed by Barbara Hendren and deposited in her bank account.

I. Exhibit L (promissory note in the principal amount of $139,190.00 to First Security Bank, signed by Rose Young and Barbara Hendren). This loan renewed one loan for $29,800.00 (the proceeds of which Barnes did not trace) and one for $105,-238.14, in the name of Rose Young. The latter loan paid off the following loans to Barbara Hendren:

 (1) $20,000.00 promissory note

 (2) $ 4,150.11 promissory note

 (3) $ 6,000.00 promissory note

 (4) $38,000.00 promissory note

 (5) $ 6,600.00 promissory note

 (6) $15,000.00 promissory note

 (7) $ 4,488.03 promissory note

 (8) $ 6,000.00 promissory note; and

 (9) $5,000.00 used to reduce a $25,000.00 loan in the name of Barbara Hendren to $20,000.00 (which loan, upon renewal, was placed in Rose Young's name)

Thus, at the January 8, 1985, hearing plaintiff introduced evidence that defendant had received approximately $312,578.14 in loan proceeds from 1980 through 1983.

2. As noted, the court received additional evidence on April 2, 1985,[3] respecting the debtor's attempt to explain under § 727(a)(5) the loss of assets consisting of these and other loan proceeds. This evidence and additional stipulations disclosed the following information with regard to the defendant's real estate holdings and encumbrances:

A. *814 Jersey Street* —This property was subject to two deeds of trust for the benefit of Valley Federal Savings and Loan Association granted on June 3, 1980, and June 15, 1982, in the principal amounts of $18,500.00 and $9,000.00, respectively. Payments totaling $15,686.53 have been made.

B. *336 Clinchfield Avenue* —This property was subject to three deeds of trust for the benefit of First Federal Savings and Loan Association or Valley Federal Savings and Loan Association executed on August 13, 1977, May 4, 1979, and July 30, 1983. The principal amounts of these deeds of trust were $12,000.00, $3,336.60, and $6,200.00, respectively. Payments totaling $11,756.61 have been made.

C. *Lee's Robo Car Wash Property* —This property was subject to a $50,000.00 lien for the benefit of Erwin National Bank, dated October 20, 1983. The defendant testified that her husband had given her the car wash, but she had given him a $20,000.00 note for the land. She testified that the $50,000.00 in loan proceeds from Erwin National Bank loan were paid to First Security Bank, but the latter transaction was not documented.

D. *Hulan property* —The defendant acquired title to this property, with her mother, by virtue of a Chancery Court decree entered on November 5, 1980. The property was sold, on August 19, 1982, to Capital Housing Development Corporation, for $85,000.00. The defendant testified that she placed $75,000.00 of the proceeds in a certificate of deposit (CD) at First Security Bank. The certificate of deposit was eventually cashed and $65,000.00 was converted to a certificate of deposit at First American National Bank—Eastern. This certificate of deposit was then pledged as collateral for a $65,000.00 loan which was taken out in the latter part of 1983.

E. *Fanny Tapp property* —The defendant acquired title to this property in the same manner as the Hulan property, and it was pledged as security for two loans at First Security Bank.

---

**3.** At the time of the hearing, the plaintiff was in the process of complying with a subpoena to produce copies of checks for interest and loan payments for the calendar year of 1981. Additionally, some checks to First Security Bank during 1983 and 1984, which had been found by reviewing microfilm, were also stipulated to at the hearing.

 These checks, totaling $86,320.51 were submitted in a stipulation on April 22, 1985.

3. It was also stipulated that the following notes, at the banks designated (not in liquidation by the FDIC), were reduced in the following manner:

| Bank | Origination Date | Principal Amount | Total Payments |
|---|---|---|---|
| Erwin National Bank | 8/10/83 | $ 2,709.39 | $ 803.76 |
| Erwin National Bank | 7/82 | $ 2,200.00 | $ 2,014.56 |
| Erwin National Bank | 11/82 | $ 5,500.00 | $ 2,259.46 |
| Erwin National Bank | (unknown) | $10,000.00 | ---------- [4] |
| First American Bank Eastern | Late 1983 | $65,000.00 | $ 4,350.00 |
| Commerce Union Bank | 5/83 | $42,000.00 | $ 8,126.86 |

Various other loan payments were listed in the stipulations which showed total payments of $113,350.04, and which also included amounts heretofore set out in paragraph 2 and in this paragraph.

4. At the hearing on April 2, 1985, the defendant introduced Exhibits 7 through 20, which were presented to represent her expenditures from 1978 through 1983.

**4.** The defendant acknowledged receipt of the proceeds and payment of the money to First Security Bank, but the record is otherwise devoid of information.

**5.** This amount was arrived at by adding the following:
a. $113,350.04 stipulated to;
b. $66,648.57 and $19,671.94 stipulated to after the hearing;
c. the defendant's average expense of $2,878.45 per month in 1982 and $1,853.16 in 1983 (Exhibit 7) multiplied by 12; and
d. Exhibits 8 through 20 and Exhibits 22 and 23.
In performing its own calculations the court arrived at a figure slightly higher than that asserted by the debtor. However, since the debtor states that she has accounted through these various exhibits for $651,941.97, Defendant's Supplemental Proposed Findings of Fact and Conclusions of Law, at 9, the court will utilize this lower figure to which she concedes.

**6.** In its Supplemental Findings of Fact and Conclusions of Law, at 4 (filed May 2, 1985) plaintiff indicated that it arrived at this figure by adding the following:
a. $113,350.04 stipulated to;
b. $66,648.57 and $19,671.94 stipulated to after trial; and
c. Exhibits 7 through 20, which were supported by check numbers or receipts, and Exhibit 23.

While the exhibits and other evidence entered in the proceeding purported to show that the defendant had spent approximately $651,941.97,[5] actual documented transactions totaled only $323,925.27.[6]

5. By adding the principal amounts of various loans the defendant had, and including the Hulan property proceeds, the plaintiff showed the defendant had received approximately $548,574.74[7] from

In reviewing the relevant exhibits the court is unable to determine precisely through what calculations plaintiff arrived at this figure. The court notes that the debtor herself maintains that only $313,291.78 in expenditures were documented. Defendant's Supplemental Proposed Findings of Fact and Conclusions of Law, at 10. However, as plaintiff's calculation led it to concede that $323,925.27 has been documented, the court has adopted this higher figure conceded to by plaintiff.

**7.** This amount was arrived at by adding the following:
a. $312,538.14, introduced in the January 8, 1985, hearing;
b. $50,000.00 from Erwin National Bank on Lee's Robo Car Wash, on October 20, 1983;
c. $27,500.00 received from Valley Federal Savings and Loan on the Jersey Street property;
d. $85,000.00 received from the Hulan land on August 19, 1982;
e. $21,536.60 received from Home Federal and Valley Federal Savings and Loan on the Clinchfield property;
f. $42,000.00 received from Commerce Union Bank in May 1983; and
g. $10,000.00 received from Erwin National Bank.
(Loans in the total amount of $17,500.00 at Watauga Valley Bank and $10,409.00 at Erwin National Bank, referred to in defendant's stipulation were not included, due to inadequate proof of the disposition of proceeds.)

1977 to the date of her petition. At least $523,238.14 of this amount was shown to have been received between January 1, 1980, and the date of the petition.

6. At trial the defendant gave unclear answers about the disposition of a $24,000.00 and $10,000.00 CD which she had at one time at First Security Bank. She could say only that the two CDs were combined in October 1983 and given to First Security Bank with some other money, but she never obtained any receipts.

7. The defendant also acknowledged receipt of the $65,000.00 from First American Bank and $42,000.00 from Commerce Union Bank after May 1983 and testified it was given to First Security Bank to pay off a $28,000.00 note for a Jaguar and interest or monthly payments or bills. The defendant concedes she had no records, other than the cancelled note on the Jaguar which was not introduced, to verify the payments.

8. The plaintiff's and defendant's proof documented only $29,790.02 paid to First Security Bank from May 1983 to February 1984.

9. As heretofore stated, debtor concedes it is "still unclear" as to exactly how much she borrowed from the various banks, but she concedes it to be between $520,000.00 and $580,000.00. Further, the debtor says that from the various exhibits she has introduced, along with the amounts stipulated to, she has accounted for $651,941.97 for the years 1977–1983, and for one or two months of 1984. She apparently would not dispute plaintiff's contention, however, that only $323,925.27 has been actually documented.[8]

10. The difference between the parties' positions can be explained as follows. At the April 2, 1985, hearing the debtor supplemented the evidence of actually documented expenditures with certain estimated summaries of cash transactions. For example, the debtor says that through Exhibit 19 she has set forth expenses of some $45,900.00 over a four year period from 1980 through 1983, such as trips for her children to and from Hawaii, estimated Christmas gifts for four years, and other trips for herself and children to Myrtle Beach, South Carolina, Atlanta, Georgia and Miami, Florida. She concedes the items and amounts are estimates, that she has not been able to find receipts, because most of the expenses set forth were "cash items." "The items included in Exhibit #19 represent debtor's best recollection of amounts spent." Defendant's Supplemental Proposed Findings of Fact and Conclusions of Law, at 6–7. Exhibit 19 is set forth as follows:

ESTIMATED EXPENSES FOR LATE 1980, 81, 82, 83
PAID FOR WITH CASH

| | |
|---|---|
| CHRISTMAS 1980 TRIP TO HAWAII TO VISIT LEE IN THE NAVY, STATIONED THERE. PLANE FARE, HOTEL ROOM, MEALS AND ETC. FOR 4 | $4,000.00 |
| AMBER HENDREN - EXPENSES FOR 4 YEARS. CLOTHING, BIRTHDAYS, DANCING LESSONS, SCHOOL EXP., TRIPS TO ERWIN, SUPPORT PAYMENTS (LEE'S OBLIGATION @ $100.MO) | 5,000.00 |
| PAID OFF RITA HENDRENS TRUCK (LEE'S X-WIFE) 1982 CASH GIVEN TO RITA | 2,800.00 |

8. See *supra* note 6.

CHRISTMAS EXPENSES, GIFTS AND ETC. FOR 4 YEARS 4,000.00

TRIPS TO MYRTLE BEACH, S.C. 4 SUMMERS FOR 3
 GAS, ROOM MEALS AND ETC. 4,000.00

TRIPS TO VISIT SON IN ATLANTA FOR 4 YEARS. ONE
 WEEK A MONTH APPROX. 12 TIMES A YEAR. 2,500.00
 GAS, HOTEL ROOM MEATS AND ETC.

JAN'S TRIP TO HAWAII TO LIVE. JUNE 1981.
 CROSS COUNTRY FROM ERWIN TO SAN
 FRANCISCO. GAS, MEALS, MOTEL ROOMS AND 3,000.00
 ETC. 2 WEEKS

 PLANE FARES 700.00

 SHIPPING CAR OF JAN'S TO HAWAII 600.00

JAN'S RETURN TRIP TO ERWIN OCT. 1981 FROM HAWAII
 PLAN FARE FOR 1 FROM HAWAII TO LOS ANGELES 1,000.00
 PLANE FARE FOR 1 FROM TENN TO LOS ANGELES

 CAR EXPENSE TO SHIP FROM HAWAII TO CAL. 600.00

 EXPENSE FROM LOS ANGELES TO TENN. 2 PEOPLE
 GAS, MOTELS, FOOD AND ETC. 2,000.00

TRIPS TO MIAMI, FLA. SIX TRIPS OVER THREE YEAR PERIOD 5,000.00

PLANE FARE FOR LEE FROM HAWAII TO ERWIN, PLUS EXPENSES 1,700.00
 1980 AND 1981

TRIPS FOR JAN TO PALM BEACH, FLA 3 OR 4 TRIPS IN 82-83 3,000.00

MOTORCYCLE FOR LEE LIVING IN SEATTLE, WASH. OCT 1982 1,500.00

TRIP TO ATLANTA, GA FOR AMBER, LEE AND BARBARA
 AUG. 1983 MOTEL, GAS, FOOD AND MIS. 1,500.00

Ex. 19 TRIP TO ATLANTIC CITY, N.J. FOR FOUR PEOPLE, SUMMER 3,000.00
 1983, FOUR PEOPLE. MOTEL ROOM, PLANE FARE,
 FOOD AND ETC. (GAMBLING MONEY)

11. To the same effect is Exhibit 11, showing estimates of some $72,600.00 in cash expenditures for traffic tickets, fines, lawyers, hospitals, prom dresses, Easter clothing, special dresses, loans to children, dental bills, yard work, groceries, parties,

car repairs and upkeep, and gas for five people over a four year period.

12. Similarly, Exhibit 12 contains an estimated expenditure of $6,100.00 in connection with trips to the hairdresser over a four year period. Exhibit 13 shows $4,800.00 in undocumented travel expenditures. Exhibit 9 shows over $1,200.00 in estimated veterinarian and pet expenses. Several other exhibits show several thousand dollars worth of unsubstantiated medical and hospital expenses.

13. The debtor correctly asserts that she cannot be penalized for "merely living extravagantly." Defendant's Supplemental Proposed Findings of Fact and Conclusions of Law, at 11. However, in the instant case the debtor indisputably obtained some $520,000.00 to $580,000.00 in loans from various financial institutions during the years in question. These loans represent money or assets passing into her hands, and once the receipts of the funds are established, it is incumbent upon her to satisfactorily explain the disposition of those assets, in this case, the moneys borrowed. The difficulty with her explanation is that a disturbingly substantial portion of the explained disposition represents her "estimates" only, without any documentary support. Even utilizing the parties' submitted figures which are most favorable to the debtor, it is clear that she must rely on such "estimates" to account for something between $196,074.73 and $224,649.47 in loan proceeds.

### III

Section 727(a)(5) provides that the court shall grant the debtor a discharge unless "the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C.A. § 727(a)(5) (West 1979).

■ Bankruptcy Rule 4005 provides that "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving his objection." However, "[o]nce the plaintiff meets the initial burden of producing evidence to prove the facts to establish the objection, the burden of going

forward with the evidence that will 'explain satisfactorily' the losses or deficiencies shifts to the debtor." 4 *Collier on Bankruptcy* ¶ 727.08 at 64 (15th ed. 1985); *Chalik v. Moorefield,* 748 F.2d 616 (11th Cir. 1984). "The creditor's burden of persuasion does not obviate the necessity that the debtor provide a satisfactory explanation of the loss of his assets." *First Texas Savings Association v. Reed,* 700 F.2d 986, 992–993 (5th Cir.1983).

■ Although precisely what constitutes a satisfactory explanation has not been definitively stated, it is clear that the debtor must explain his or her losses in such a manner as to convince the court of good faith. 4 *Collier on Bankruptcy* ¶ 727.08 (15th ed. 1985). As this court has previously observed, "[t]he standard by which the explanation is measured may then be said to be one of reasonableness or credibility." *Slocum v. Wheeler,* 38 B.R. 842, 846 (Bankr.E.D.Tenn.1984).

As the court observed in *Chalik,* "[v]ague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." *Chalik,* 748 F.2d at 619. In *Chalik* the court denied a discharge to a debtor offering no documentation to corroborate his testimony that proceeds obtained from his execution of a $130,000.00 promissory note were invested in two defunct corporations and spent on living expenses. *See also First Texas Savings Association v. Reed,* 700 F.2d 986 (5th Cir.1983) (debtor's assertion that $19,586.83 was consumed by business and household expenses and unspecified gambling losses held unsatisfactory); *Baum v. Earl Millikin, Inc.,* 359 F.2d 811, 814 (7th Cir.1966) (under former Bankruptcy Act's predecessor provision to § 727(a)(5) satisfactory explanation "must consist of more than ... [a] vague, indefinite, and uncorroborated hodgepodge of financial transactions."); *Moramerica Mortgage Co. v. Belk,* 44 B.R. 793 (Bankr.S.D. Fla.1984) (unsupported generalities offered by debtor to explain loss of $9.6 million

worth of assets held not to constitute satisfactory explanation).

Certainly, this is not to say that the absence alone of records, receipts, and cancelled checks mandates an uncritical and automatic denial of discharge under § 727(a)(5). For example, in *Wheeler* the debtor documented the expenditure of $88,780.00 out of some $105,865.00 in loan proceeds. This court found reasonable debtor's explanation that the undocumented balance of $17,085.00 was paid directly on bank obligations (without being routed through her accounts) or consumed in ordinary living expenses. Similarly, in *Federal Deposit Insurance Corporation v. Church*, 47 B.R. 186 (Bankr.E.D.Tenn. 1985) this court recently found credible and satisfactory the debtor's explanation of his disposition of $55,752.00 in cash during the eight months preceding his bankruptcy.

However, in this connection the classic pronouncement of *In re Shapiro & Ornish*, 37 F.2d 403 (N.D.Tex.1929), *aff'd sub nom. Shapiro & Ornish v. Holliday*, 37 F.2d 407 (5th Cir.1930) is apposite:

> The word "satisfactorily," as contained in the amendment referred to, may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation—he believes what the bankrupts say with reference to the disappearance or the shortage. He is satisfied. He no longer wonders. He is contented.

*Shapiro & Ornish*, 37 F.2d at 406.

 The debtor's explanation fails in the instant case to meet that test. In so concluding, this court has been guided first by basic considerations of credibility. The court notes that the debtor's testimony in other areas evidenced some substantial and disturbing inconsistencies. A determination of credibility involves not simply an assessment of whether the court is dealing with willful, flagrant falsehood but also an assessment of whether the court has been provided acceptably accurate information bearing some reasonable relationship to actual fact. In short, the court must have, as it did in both *Church* and *Wheeler,* some sense that it is dealing with more than an unreliable remake of reality, custom-made to comport with current exigencies.

The court has also given consideration to the large amount of undocumented expenditures in question, considering especially the size of that amount in relation to the nature of the expenditures alleged. In *Wheeler* the court was asked to accept as satisfactory an explanation of undocumented expenditures of some $17,085.00 on loan obligations and living expenses. In *Church* the court was asked to accept as satisfactory an explanation of the disposition of $50,950.00 in cash proceeds on personal and business expenses by the debtor businessman. The debtor there provided not merely detailed but credible, and corroborated, evidence regarding his lifestyle and spending habits and, indeed, further bolstered his credibility by acknowledging and accounting for additional cash proceeds of which the plaintiff was not aware. Here, the court is asked to accept as satisfactory an undocumented, uncorroborated explanation of the disposition of between $196,074.73 and $224,649.47 in primarily personal expenditures—approximately 38 to 41 per cent of the total loan proceeds traced to the debtor.

Section 727(a)(5) simply places some limits on what the bankruptcy court is permitted to take on faith. This court is compelled to conclude that the debtor has failed to explain satisfactorily, within the meaning of § 727(a)(5), the loss of assets or deficiency of assets to meet the debtor's liabilities. Accordingly, the debtor's discharge must be denied. In view of this determination it is not necessary to consider plaintiff's other grounds for denial of discharge.

In accordance with Bankruptcy Rule 7052, this Memorandum constitutes findings of fact and conclusions of law.