**In re Donald HEIL d/b/a Heil Auto Ranch, Debtor.**

**Buckeye Retirement Company, LLC, as successor in interest to the Cadle Company, Plaintiff,**

v.

**Donald Heil, Defendant.**

**Bankruptcy No. 02–31194.**

**Adversary No. 02–3116.**

United States Bankruptcy Court, E.D. Tennessee.

Feb. 21, 2003.

Hodges, Doughty & Carson, PLLC, Keith L. Edmiston, Esq., Knoxville, TN, for Plaintiff.

Rose, Williams & Cornwell, PLLC, Hilary Hayes Williams, Esq., Maryville, TN, for Defendant.

## MEMORANDUM

RICHARD S. STAIR, Jr., Bankruptcy Judge.

This adversary proceeding is before the court upon the Complaint to Revoke and Deny Discharge of Debtor Under 11 U.S.C. § 727 on the Ground of Fraud (Complaint) filed by the Plaintiff, Buckeye Retirement Company, LLC (Buckeye), as successor in interest to the Cadle Company, on July 1, 2002. By its Complaint, the Plaintiff seeks the revocation of the Debtor's discharge pursuant to either 11 U.S.C.A. § 727(d)(1) or (2) (West 1993). The trial was held on January 15, 2003. The record before the court consists of seven exhibits stipulated to by the parties and the testimony of four witnesses, Horace M. Brown, Michael H. Fitzpatrick, Debra Heil, and the Debtor.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(J) (West 1993).

I

The Debtor filed the Voluntary Petition commencing his Chapter 7 bankruptcy case on March 5, 2002, and an Order granting his discharge was entered on June 18, 2002. In its Complaint, Buckeye avers that the Debtor's discharge should be revoked and denied pursuant to § 727(d)(1) for failing to disclose prepetition assets, thus allowing him to obtain his discharge through actual fraud. In the alternative, Buckeye avers that the Debtor acquired and fraudulently concealed property of the estate, justifying revocation of his discharge pursuant to § 727(d)(2).

The issues before the court, as outlined in the Pretrial Order entered on November 21, 2002, are: (1) whether the Debtor obtained his discharge through fraud; and (2) whether the Debtor acquired property which was property of the estate and knowingly and fraudulently failed to report the acquisition or to deliver or surrender such property to the trustee.

II

The primary purpose behind the Bankruptcy Code is to relieve the "honest but unfortunate debtor" of his indebtedness, allowing him to make a "fresh start." *In re Krohn,* 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). This fresh start is accomplished through discharge. *See* S. REP. No. 95–989, at 7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5793. Discharge under Chapter 7 of the Bankruptcy Code is governed by 11 U.S.C.A. § 727, which provides, in material part:

(a) The court shall grant the debtor a discharge, unless—

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with cus-

tody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

. . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

. . . .

(b) Except as provided in section 523 of this title,[1] a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter

. . . .

. . . .

(d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge; [or]

(2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee[.]

11 U.S.C.A. § 727 (West 1993). *See also* Fed. R. Bankr. P. 4004(c). However, "[t]here is no constitutional right to obtain a discharge of one's debts in bankruptcy. . . . [I]t is a legislatively created benefit." *United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 636–37, 34 L.Ed.2d 626 (1973).

The effects of a discharge obtained pursuant to § 727 are governed by 11 U.S.C.A. § 524, which states, in part:

(a) A discharge in a case under this title—

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727 . . . of this title . . . ;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . ; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim[.]

11 U.S.C.A. § 524(a) (West 1993). Because § 524(a) creates a permanent injunction that prevents a debtor from being liable for prepetition debts once they are discharged, obtaining entry of a discharge order is generally the Chapter 7 debtor's ultimate goal. It is through the discharge

1. 11 U.S.C.A. § 523(a) (West 1993) provides for eighteen specific exceptions to a debtor's general discharge, rendering specific debts nondischargeable.

that a debtor receives his or her fresh start.

■■■ Even though the Bankruptcy Code does not explicitly state that a Chapter 7 debtor must file and proceed through his bankruptcy in good faith, this concept is implicit in the concept of bankruptcy providing a debtor with a "fresh start." *Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir.1991). "Good faith and candor are necessary prerequisites to obtaining a fresh start [through discharge]." *Id.* (quoting *McLaughlin v. Jones (In re Jones)*, 114 B.R. 917, 926 (Bankr.N.D.Ohio 1990)). "A debtor is required to be fair and honest with the [c]ourt and make full and accurate disclosure in all of the documents filed with the [c]ourt." *Buckstop Lure Co. v. Trost (In re Trost)*, 164 B.R. 740, 749 (Bankr.W.D.Mich.1994).

■■■ When information arises after a debtor's discharge is granted either evidencing that the debtor obtained his discharge through fraud unknown at the time of discharge, demonstrating that the debtor acquired or should have acquired property that he then "knowingly and fraudulently" failed to report or deliver to the Chapter 7 trustee, or establishing that the debtor refused to obey a court order or to testify, revocation of the debtor's discharge may be requested by the Chapter 7 trustee, a creditor, or the United States Trustee. *See* § 727(d). The burden of proof is by a preponderance of the evidence, borne by the party requesting revocation. *Miller v. Miller (In re Miller)*, 246 B.R. 559, 562 (Bankr.E.D.Tenn.2000). Revocation of a debtor's discharge is an extraordinary remedy, so § 727(d) is liberally construed in favor of the debtor and strictly construed against the party seek-

ing revocation. *Trost*, 164 B.R. at 743; *see also Borock v. Telesz (In re Ventimiglia)*, 198 B.R. 205, 213 (Bankr.E.D.Mich.1996). A discharge may not be revoked based upon a debtor's "ignorance of the law or carelessness of the parties." *Trost*, 164 B.R. at 744.

## III

■■■ In order for the court to revoke the Debtor's discharge under § 727(d)(1), Buckeye must establish that the Debtor "committed fraud in fact, not fraud in law, or implied fraud." *Trost*, 164 B.R. at 748. This fraud must have occurred in the Debtor's obtaining of his discharge, and "sufficient grounds must have existed which would have prevented the discharge had they been known and presented at the time." *Id.* "As a general rule, to obtain relief under § 727(d)(1), it is insufficient that a debtor's fraud rendered a particular debt nondischargeable; claimant must allege that the entire discharge would not have been granted but for debtor's fraud." *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir. 1991). Moreover, the party seeking revocation of the discharge must not have known sufficient facts regarding the Debtor's actions and/or omissions "such that [it was] put on notice of a possible fraud." *Mid–Tech Consulting, Inc. v. Swendra*, 938 F.2d 885, 888 (8th Cir.1991).

■■■ Buckeye asserts that the Debtor failed to disclose, and in fact concealed, assets of his estate, including a $14,500.00 prepetition obligation owed to him and a $500.00 payment made pursuant to this obligation. Buckeye also alleges that the Debtor failed to disclose ownership of land in Scott County, Tennessee,[2] and a silent

---

2. At trial, it was determined that the Debtor had, in fact, disclosed a previous ownership of two lots located in LaFollette, Tennessee, on his original and amended Statements of Financial Affairs. The court notes, however, that on both Statements of Financial Affairs,

ownership interest in HHP Enterprises, LLC (HHP), which has considerable assets itself.[3] At trial, the parties stipulated that Buckeye was not aware of the facts that it asserts constitute cause to revoke the Debtor's discharge prior to the entry of the discharge order by the court.

The crux of Buckeye's argument centers around the Debtor's failure to disclose an outstanding obligation owed to him by Horace Brown pursuant to a real estate transaction. Mr. Brown testified that he had originally entered into a real estate transaction with Hugh Myers, who is a friend of both Mr. Brown and the Debtor. In a separate transaction between Mr. Myers and the Debtor, the Debtor acquired Mr. Brown's obligation owing to Mr. Myers.[4]

Mr. Brown testified that on April 3, 2002, he gave the Debtor a cashier's check in the amount of $500.00 towards his outstanding obligation. At that time, Mr. Brown was informed by the Debtor that his outstanding balance was $14,500.00, and the Debtor executed a receipt acknowledging this fact. See Collective Trial Ex. 5. Mr. Brown further testified that he

was unaware that the Debtor had filed for bankruptcy at their meeting on April 3, 2002.

Mr. Brown first learned that the Debtor had filed for bankruptcy when they encountered each other at the Howard H. Baker, Jr. United States Courthouse sometime around May 23, 2002. At that time, the Debtor told Mr. Brown that he had filed for bankruptcy, and Mr. Brown testified that he instructed the Debtor to disclose their transaction.[5] Mr. Brown also testified that the Debtor asked him not to say anything about seeing him there, but that he did not interpret that statement one way or another.

Mr. Brown testified that approximately two weeks later he discovered that the Debtor had not listed their transaction in his Statements and Schedules filed with the court, so he contacted Michael H. Fitzpatrick, the Chapter 7 Trustee, by telephone to inform him of the obligation. Mr. Fitzpatrick asked Mr. Brown to put the specific details of the transaction in writing, which Mr. Brown did via a letter to Mr. Fitzpatrick dated June 20, 2002.[6]

---

the Debtor listed these properties as having been transferred to the Next to Heaven Stables in September 2001, but at his § 341 meeting held on June 3, 2002, the Debtor testified that these lots were transferred via Quit Claim deed to his wife individually and not actually to the Stables. See Trial Ex. 7.

**3.** This assertion was based on Mrs. Heil's testimony at her deposition taken on January 6, 2003, that the Debtor had a 51% ownership interest in HHP. At trial, Mrs. Heil affirmed that statement, but the Debtor later testified that his brother was the principal of HHP, that the Debtor had been offered an opportunity to become a member, but that he lacked the necessary $250,000.00 investment. There was some evidence offered regarding a right to receive a payment from HHP if property owned by it is sold in the future; however, Buckeye offered no substantial evidence to refute the Debtor's testimony that he was only

entitled to payment "morally" and that he was not actually a member of HHP.

**4.** The three parties memorialized their respective agreements into an Agreement dated May 7, 2001, which details the different transactions at issue. This Agreement is a part of Collective Trial Ex. 5. It is not necessary to give particulars regarding the separate real estate transactions beyond those stated above.

**5.** Mr. Brown is a licensed attorney who practices law in the State of Tennessee, primarily in the area of bankruptcy. As such, he is well versed in the forms necessary to file for bankruptcy and the information that must be disclosed in those forms.

**6.** Mr. Brown testified that he and his family left the day after he saw the Debtor in the federal courthouse and that they were gone for approximately two weeks. Shortly after

*See* Collective Trial Ex. 5. After he received Mr. Brown's letter, Mr. Fitzpatrick informed Buckeye's attorneys of Mr. Brown's outstanding obligation. Since June 20, 2002, Mr. Brown has remitted all payments on the obligation to Mr. Fitzpatrick for administration.

The Debtor confirmed Mr. Brown's testimony regarding their meeting at the federal courthouse, that Mr. Brown had informed the Debtor to disclose their transaction, and that he had asked Mr. Brown "not to say anything" at that time. The Debtor explained, to the court's satisfaction, that he asked Mr. Brown "not to say anything" because he was embarrassed for Mr. Brown to know that he had filed for bankruptcy. The Debtor also testified that despite Mr. Brown's instruction to disclose their transaction, he did not disclose it because he believed that the transaction between them was a "company debt" owed to his business, the Next to Heaven Stables (the Stables). The Debtor testified that it was a "company deal" because he had used funds from the Stables to purchase the obligation from Mr. Myers and because he had deposited all monies received from Mr. Brown pursuant to the obligation directly into the Stables' checking account.

The court has several concerns relative to the Debtor's testimony regarding his failure to disclose the transaction with Mr. Brown based upon his assertion that it was a "company deal." First, the parties agreed that the Debtor did not disclose the existence of this obligation to his attorney. However, in his first Statement of Financial Affairs, filed on March 5, 2002, the Debtor disclosed the transfer of the two

LaFollette lots from his individual name to the Stables' name, indicating "All payments on mortgage with 1st Volunteer State Bank had been made by the grantee company and was in actuality a company investment."[7] Additionally, in his Amended Statement of Financial Affairs, filed on June 3, 2002, at Mr. Fitzpatrick's insistence, the Debtor added an additional transfer of property to the John M. and Lynn Blackburn and Joe A. and June M. Blackburn Trust. The Debtor described this transfer as follows:

> 60 acres Claiborne County 3 party deal in avoidance of deed-in-lieu of foreclosure. $152,000.00 balance after taxes and liens, $38,640.13 to Debtor and non-filing spouse. Proceeds deposited in Next to Heaven Stables account, which made all previous pmts [sic].

At trial, the Debtor acknowledged that Mr. Myers was also involved in this "3 party deal" which he also described as being a "company investment." There are too many similarities between the Blackburn transfer and the transaction with Mr. Brown for the court to accept that the Debtor actually believed that he had to disclose the former, where he had already received the proceeds in full, but that he did not need to disclose the latter, from which he was still receiving money, especially when he characterized both as "company investments."

Second, the court is concerned with the Debtor's testimony that he was unaware that he could put property in a company's name, but that when he learned differently, he transferred the two LaFollette lots to the Stables in order to "get it out of his

---

returning from vacation, Mr. Brown researched the Debtor's bankruptcy file and determined that the Debtor had not listed their transaction in his bankruptcy schedules.

Thereafter, Mr. Brown sent his letter to Mr. Fitzpatrick.

**7.** *See supra* n. 2.

name." [8] This testimony is troubling because the Debtor evidenced a knowledge of corporations and limited liability companies, among other things, indicating a business sophistication beyond what he attempted to convey at trial. Additionally, when specifically asked at trial why he did not disclose Mr. Brown's obligation, the Debtor testified that "it was like a 401(k)," that "Debbie [Heil] has to be protected in her investments too," and that he did not feel that it belonged in his personal bankruptcy for those reasons. [9]

All things considered, the court's concerns with these inconsistencies, without more, would not necessarily justify revoking the Debtor's discharge; however, there is one final fact that the court simply cannot reconcile or disregard. Mr. Brown testified, as did the Debtor, that at their chance meeting at the federal courthouse, Mr. Brown specifically told the Debtor that he needed to disclose to Mr. Fitzpatrick their business relationship and the obligation owed by Mr. Brown. This occurred on or about May 23, 2002, eleven days before the Debtor filed his Amended Statements and Schedules and testified at his continued § 341 meeting, and almost four weeks prior to the Debtor's discharge. Nevertheless, the Debtor did not disclose the transaction to either his attorney or to Mr. Fitzpatrick, despite the fact that he knew that Mr. Brown is an attorney, practicing primarily in the area of bankruptcy.

In the court's opinion, the fact that the Debtor failed to disclose this transaction, after Mr. Brown specifically instructed him to, convinces the court that the Debtor purposefully concealed the transaction, the obligation, and the payments received postpetition not only from his creditors and Mr. Fitzpatrick, but also from his own attorney because he knew that disclosure was required.

### IV

In order to revoke the Debtor's discharge under § 727(d)(1), these acts by the Debtor must fit into one of the § 727(a) exceptions to discharge had the facts been known and a complaint filed prior to the discharge. Buckeye contends that denial of discharge would have been justified under either § 727(a)(2)(A), § 727(a)(2)(B), or § 727(a)(4)(A). To this end, Buckeye, as the objecting party, is held to the burden of proof that would be required in a § 727 objection to discharge action, which is by a preponderance of the evidence, construed liberally in favor of the Debtor. FED. R. BANKR. P. 4005; *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir.2000); *Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 393 (6th Cir.1994).

### A

Buckeye argues first that the Debtor's failure to disclose his transaction

---

**8.** The Debtor also testified that he transferred the property to the Stables because he understood that Buckeye was attempting to domesticate its judgment against him and he did not want Buckeye to execute on that land. Moreover, even though the Debtor testified that this land is owned by the Stables, which makes payments to First Volunteer Bank, the Debtor still disclosed this debt in his Statements and Schedules, but did not find it necessary to disclose the transaction with Mr. Brown to any party based upon his assertion that it was a Stables' asset.

**9.** Both the Debtor and Mrs. Heil testified that the Stables is now operated as a Limited Liability Corporation (L.L.C.), owned entirely by Mrs. Heil, her daughter, and the Debtor's son, and that the Debtor is simply an employee. Interestingly, although just an employee, the Debtor continued to deposit all of the payments received from Mr. Brown, payable only to the Debtor, into the L.L.C.'s bank account.

with Mr. Brown falls under § 727(a)(2)(A), which is comprised of two elements: "1) a disposition of property [including transfer or concealment] ..., and 2) 'a subjective intent on the debtor's part to hinder, delay, or defraud a creditor through the act disposing of the property.'" *Keeney*, 227 F.3d at 683 (quoting *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir.1997)). The intent must be actual, not constructive; however, because it is difficult to prove intent, a plaintiff may use circumstantial evidence and/or evidence of a debtor's conduct to establish actual intent. *Hunter v. Sowers (In re Sowers)*, 229 B.R. 151, 157 (Bankr.N.D.Ohio 1998). Although "[j]ust one wrongful act may be sufficient to show actual intent ... a continuing pattern of wrongful behavior is a stronger indication [thereof]." *Id.* It is not necessary to prove a debtor possessed the intent to hinder, delay, and defraud; proof of any one satisfies § 727(a)(2)(A). *Cuervo v. Snell (In re Snell)*, 240 B.R. 728, 730 (Bankr.S.D.Ohio 1999).

**B**

■■■■ In the alternative, Buckeye argues that the Debtor concealed property of the estate postpetition, namely the $500.00 payment he received from Mr. Brown on April 3, 2002, falling within the scope of § 727(a)(2)(B), which requires proof that "(1) the debtor transferred or concealed property, (2) such property constituted property of the estate, (3) the transfer or concealment occurred after the filing of the bankruptcy petition, and (4) the transfer or concealment was made with the intent to defraud the bankruptcy trustee." *Sowers*, 229 B.R. at 156. Once a prima facie case is established, the debtor must "come forward with an explanation for the concealment that convinces a judge [otherwise]." *Royer v. Smith (In re Smith)*, 278 B.R. 253, 257 (Bankr.M.D.Ga.2001) (citing *Chalik v. Moorefield (In re Chalik)*, 748

F.2d 616, 619 (11th Cir.1984)). Like § 727(a)(2)(A), intent under § 727(a)(2)(B) may be established by evidence of a debtor's conduct. *Sowers*, 229 B.R. at 157.

**C**

■■■■ Finally, Buckeye argues that the Debtor's failure to disclose the transaction with Mr. Brown and/or the postpetition $500.00 payment from Mr. Brown in either his original bankruptcy schedules, his amended bankruptcy schedules, and/or either of his two separate § 341 meetings of creditors constitutes cause to deny discharge under § 727(a)(4)(A), which requires the objecting party to prove the following: (1) that the debtor made a statement while under oath; (2) which was false; (3) the debtor knew that the statement was false when making it; (4) the debtor had fraudulent intent when making the statement; and (5) the statement materially related to the bankruptcy case. 11 U.S.C.A. § 727(a)(4)(A); *Keeney*, 227 F.3d at 685; *Hendon v. Oody (In re Oody)*, 249 B.R. 482, 487 (Bankr.E.D.Tenn.2000).

A debtor's statements and schedules are executed under oath and penalty of perjury. FED. R. BANKR. P. 1008; OFFICIAL FORM 1 (Voluntary Petition); OFFICIAL FORM 7 (Statement of Financial Affairs); *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (6th Cir. BAP 1999); *see also Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992). Likewise, statements made at a debtor's § 341 meeting of creditors are also made under oath. 11 U.S.C.A. § 343 (West 1993) ("The debtor shall appear and submit to examination under oath at the meeting of creditors under section 341(a) of this title."); FED. R. BANKR. P.2003(c); *see, e.g., In re Clemmons*, 151 B.R. 860, 862 (Bankr. M.D.Tenn.1993); *In re Kincaid*, 146 B.R. 387, 388 (Bankr.W.D.Tenn.1992); *Fed. Deposit Ins. Corp. v. Hendren (In re Hen-*

*dren)*, 51 B.R. 781, 782 (Bankr.E.D.Tenn. 1985).

A debtor's knowledge that a statement is false can be evidenced by a demonstration that the debtor "knew the truth, but nonetheless failed to give the information or gave contradictory information." *Hamo*, 233 B.R. at 725; *Sowers*, 229 B.R. at 158 (citing *Pigott v. Cline (In re Cline)*, 48 B.R. 581, 584 (Bankr.E.D.Tenn.1985)).

Fraudulent intent "involves a material representation that [a debtor knows] to be false, or, what amounts to the same thing, an omission that [he knows] will create an erroneous impression." *Keeney*, 227 F.3d at 685 (quoting *In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998)). A reckless disregard or indifference for the truth also evidences fraudulent intent. *Id.* at 686; *Beaubouef*, 966 F.2d at 178. Once again, intent may be inferred from a debtor's conduct, and a continuing pattern of omissions and false statements in a debtor's bankruptcy schedules exhibits reckless indifference. *Hamo*, 233 B.R. at 724–25; *Sowers*, 229 B.R. at 159. On the other hand, if a debtor simply gives false information mistakenly or inadvertently, the intent element is not satisfied. *Keeney*, 227 F.3d at 686; *Hamo*, 233 B.R. at 725. Generally, a debtor's amendment of his schedules and/or reporting of omissions or misstatements prior to or at the meeting of creditors evidences a lack of fraudulent intent. *Gold v. Guttman (In re Guttman)*, 237 B.R. 643, 647 (Bankr.E.D.Mich. 1999). On the other hand, a debtor "is not permitted to decide to omit an asset because the debtor believes it lacks value." *Id.* at 649 (collecting cases).

Statements "bear[ing] a relationship to the [debtor's] business transactions or estate, or concern[ing] the discovery of assets, business dealings, or· the existence and disposition of property" are material for the purposes of § 727(a)(4). *Keeney*, 227 F.3d at 686 (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir.1997)). In other words, "[a] claim is material if it hinders the administration of the [bankruptcy] estate." *Calisoff v. Calisoff (In re Calisoff)*, 92 B.R. 346, 355 (Bankr.N.D.Ill.1988).

## V

As previously discussed, the court found problematic the Debtor's failure to disclose his transaction and the obligation with Mr. Brown and his failure to disclose the $500.00 postpetition payment pursuant to this obligation in statements and schedules and his testimony at his § 341 meetings. The Debtor asserts that he failed to disclose the transaction with Mr. Brown and the postpetition payment based upon his belief that the debt belonged to the Stables and not to him personally. Again, for the reasons stated above, the court finds these assertions to be unreasonable. The Debtor's failure to disclose the transaction and the obligation owed by Mr. Brown pursuant thereto and his failure to disclose the postpetition payment received from Mr. Brown, when taken together with the disclosures that the Debtor did make and the fact that Mr. Brown specifically advised him to disclose, satisfy the court that discharge could have been denied under § 727(a)(2)(A), § 727(a)(2)(B), and/or § 727(a)(4)(A).

The cumulative evidence presented to the court establishes the Debtor's fraudulent intent, or at the very least, his reckless indifference for the truth, which is a requisite for each section. In addition, under § 727(a)(2)(A), Buckeye has met its burden of proof that the Debtor concealed property of the estate, i.e., the obligation owed by Mr. Brown. Property of the Debtor's bankruptcy estate consisted of "all legal or equitable interests of the debt-

or in property as of the commencement of the case." 11 U.S.C.A. § 541(a)(1) (West 1993). The Debtor testified that he believed this obligation to be the Stables' debt; however, the Debtor operated the Stables as a sole proprietorship until transferring his interest to Mrs. Heil.[10] Furthermore, until it was closed on June 5, 2002, the Stables' checking account with BB & T Bank was "owned" by the Debtor.[11] Moreover, the Debtor admitted that at the time of the transaction involving Mr. Brown, the Stables was, in fact, a sole proprietorship owned by the Debtor. Accordingly, regardless of what the Debtor believed, the obligation was property of the bankruptcy estate.[12]

Likewise, Buckeye has satisfied its burden that discharge could have been denied under § 727(a)(2)(B). The Debtor concealed both the obligation and the postpetition payment made on behalf thereof, both were property of the estate, they were not disclosed after he filed his bankruptcy petition, and once again, fraudulent intent can be inferred from the Debtor's cumulative acts and omissions, as previously discussed.

Finally, the court agrees that it could have denied discharge pursuant to § 727(a)(4)(A). The Debtor failed to disclose the transaction with Mr. Brown and the resulting obligation a total of four times: (1) in his original bankruptcy Statements and Schedules filed on March 5, 2002; (2) at his initial § 341 meeting held on April 8, 2002; (3) in his amended Statements and Schedules filed on June 3, 2002; and (4) at the continuation of his § 341 meeting held on June 5, 2002. The Debtor was under oath during all of these instances, he acknowledged at trial that he was aware of the "deal" with Mr. Brown at the time these omissions were made, the court has found that he possessed the requisite fraudulent intent when the omissions were made, and clearly, an omission of a $14,500.00 debt is "material" to the Debtor's bankruptcy case.

## VI

For the reasons stated above, the court finds that cause exists under § 727(d)(1) to revoke the Debtor's discharge entered on June 18, 2002. Because the court is revoking the discharge under § 727(d)(1), it is

10. A sole proprietorship is defined as "[a] form of business in which one person owns all the assets of the business in contrast to a partnership, trust or corporation." BLACK's LAW DICTIONARY 1392 (6th ed.1994). See also Hitt v. Hitt, No. 02A01–9310–CV–00218, 1994 Tenn.App. LEXIS 645, at *6, 1994 WL 618608, at *2 (Tenn.Ct.App. Nov.9, 1994) (quoting BLACK's LAW DICTIONARY 1248 (5th ed.1979)). Assets of the Stables, as a proprietorship of the Debtor, are property of the Debtor's bankruptcy estate.

11. The account was opened on May 9, 2001, pursuant to an application to open a Small Business Checking Account, with the Debtor listed under "Ownership of Account—Business Purpose" as a "sole proprietorship for profit." See Collective Trial Ex. 4. The Back-up Withholding Certifications section was ex-

ecuted solely by the Debtor, while the signature card was signed by the Debtor and Mrs. Heil. See id. Additionally, "Donnie L. Heil DBA Next to Heaven Stables" was listed as "Account Owner." See id. The account was originally with BankFirst, which was subsequently bought out by BB & T Bank.

12. The court also notes that Mr. Brown believed that he owed the obligation directly to the Debtor, and he made all payments to the Debtor individually. Moreover, upon learning that the Debtor had filed for bankruptcy, Mr. Brown immediately began making his payments to Mr. Fitzpatrick, in his capacity as Chapter 7 Trustee. Moreover, in the Agreement between Mr. Brown, Mr. Myers, and the Debtor, the Stables are not mentioned.

not necessary to determine revocation under § 727(d)(2).